Ann HANSEN, Appellee,

v.

Patricia Roberts HARRIS, Secretary of Health, Education and Welfare, Appellant.

No. 324, Docket 79–6125.

United States Court of Appeals, Second Circuit.

Argued Oct. 26, 1979.

Decided March 24, 1980.

---

13. See notes 5 and 12 *supra*.

Richard Beattie, Stanley Ericsson, Dept.
of HEW (Stuart E. Schiffer, Acting Asst.
Atty. Gen., Washington, D. C., William B.
Gray, U. S. Atty., Jerome J. Niedermeier,
Asst. U. S. Atty., Rutland, Vt., Randolph W.

Gaines, Chief of Litigation, Baltimore, Md., of counsel), for appellant.

Ronald Lospennato, Walter M. Morris, Jr., St. Johnsbury, Vt., Vermont Legal Aid, Inc., for appellee.

Before FRIENDLY, OAKES and NEWMAN, Circuit Judges.

OAKES, Circuit Judge:

This appeal does not involve a great deal monetarily: appellee is seeking mother's insurance benefits, as provided in 42 U.S.C. § 402(g)[1] for the year preceding June 12, 1974. Yet the case does raise a significant issue of estoppel against the Government. The Department of Health, Education and Welfare (HEW)[2] appeals from a decision of the United States District Court for the District of Vermont, Albert W. Coffrin, Judge, holding for the applicant and overturning an earlier decision of the administrative law judge that had been upheld by the HEW Appeals Council.

Appellee, whose former husband died in 1967, became eligible for benefits as a divorced mother when the Social Security Amendments of 1972, Pub.L.No.92–603, 86 Stat. 1329, § 114(c), took effect on January 1, 1973. She did not, however, file the required written application, see 42 U.S.C. § 402(g)(1)(D), until May 1975. The estoppel question arises from the actions of a Social Security Field Representative who, on June 12, 1974, supplied the applicant with misinformation about her eligibility and did not encourage her to file a written application. On that date, after hearing from a fellow employee and a local attorney that she might be eligible, appellee went with her mother to the Newport, Vermont, Social Security Office. There she had a ten- to fifteen-minute interview with Dan Connelly, the Social Security Field Representative. Connelly does not recall the meeting, but his daily record for June 12, 1974 includes the last names of appellee and her two sons, followed by the notation,"P/AD," which Connelly described as an abbreviation for "post adjudication action." This means that, according to his notes, he was talking to her about a claim that had already been determined adversely. As described in appellee's testimony, however, testimony that was substantially credited by the administrative law judge, the following occurred:

A. And I went in to file a form for Mother's Benefits—Divorced Mother's Benefits.

Q. All right, now, was he alone there?

A. Yes, he was.

1. 42 U.S.C. § 402(g)(1) provides in pertinent part:

> (g)(1) The widow and every surviving divorced mother . . . of an individual who died a fully or currently insured individual, if such widow or surviving divorced mother—
>
> . . . . .
>
> (D) has filed application for mother's insurance benefits, or was entitled to wife's insurance benefits on the basis of the wages and self-employment income of such individual for the month preceding the month in which he died,
>
> (E) at the time of filing such application has in her care a child of such individual entitled to a child's insurance benefit, and
>
> (F) in the case of a surviving divorced mother—
>
> (i) the child referred to in subparagraph (E) is her son, daughter, or legally adopted child, and
>
> (ii) the benefits referred to in such subparagraph are payable on the basis of such individual's wages and self-employment income,

shall (subject to subsection (s) of this section) be entitled to a mother's insurance benefit for each month, beginning with the first month after August 1950 in which she becomes so entitled to such insurance benefits and ending with the month preceding the first month in which any of the following occurs:. . . . .

The application of this section to widows but not to widowers was held unconstitutional in *Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975). Since that time, HEW has by regulation authorized "father's insurance benefits" for widowers, *see* 20 C.F.R. §§ 404.335–.337, but it still apparently grants benefits to "surviving divorced mothers" that are not granted to a surviving divorced father, *id.*

2. This department has recently been divided, but will be referred to here by its traditional name.

Q. And was it in the morning, or afternoon, or when was it?

A. No—excuse me—but it was in the afternoon, your Honor.

Q. And how long did you spend there?

A. It couldn't have been any longer than between 10 to 15 minutes, if it was that long.

Q. And did you discuss with him anything else other than filing that application?

A. No. He asked who I was, and I told him, "Ann Riegel Hansen" and that my boys had a claim there, two Riegel boys, and I—I told him that I had heard that I was illegible (sic) for Divorced Mother's Benefits, I was not—

Q. That you were eligible or not?

A. That I was.

Q. All right.

A. And I was there to file a form,—

Q. Uh-huh.

A. —and he—well, I (unintelligible)—

Q. What did he tell you?

A. He asked me—he said, "Were you ever married to the guy?" And I—I just looked at him and—

Q. What'd you tell him?

A. —he repeated the question again, because I was stunned, and I said, "Well, I can cross the street and go over to the City Clerk's office and get you a marriage certificate." And he said, "Oh, no, no," he says, "that won't be necessary."

Q. All right, what else did he say?

A. And then he asked me what my marital statchus (sic) was at the time,—

Q. Uh-huh.

A. —"Were you divorced?" And I said, "Yes," and he said, "Well, that's it," his hands went up in the air, he said, "That's it then, that's why you're not illegible (sic)."

Q. Well, wait, did he say just, "That's it," or what else did he say, as near as you recall, after he said, "That's it," what—

what else did he say by way of explanation?

A. He said, "That's it, it's because you're divorced that you're not illegible (sic)."

Q. Did he say that you were not eligible?

A. He said I was not illegible (sic) to file a form for Mother's Benefits.

Q. Now, did he say the words that, "You aren't eligible?"

A. Yes, your Honor.

Q. Or did he just say, "That's it"?

A. He said, "That's it," and he said, "You're not illegible (sic) to file a form because you are divorced at the time."

Q. And did he give you any other explanation?

A. No he didn't.

When the administrative law judge asked appellee how she remembered Connelly's name, she replied, "Because he had given me a rude time." She described Connelly as being "very short, very in a hurry," and said that she was "very put out because of the questions [as to whether she had been married]." Appellee's mother testified that she had gone to the Social Security Office with her daughter and that she had stayed in the waiting room throughout the interview; she remembered that when the daughter had emerged from the office she was "very mad" and "quite upset" about Connelly's inquiry into whether she and her former husband had ever been married. Appellee and her mother left the office without taking further action and appellee made no further contact with the Social Security Administration, or with the lawyer who had suggested that she visit the Social Security Office, until May 1975, when a booklet sent by the Administration and a telephone call confirmed the fact that she was eligible. At that point, she received benefits retroactive one year to May 1974, as provided by 42 U.S.C. § 402(j),[3] but no benefits for any time prior to that date.

---

**3.** 42 U.S.C. § 402(j)(1) provides in pertinent part:

(j)(1) An individual who would have been entitled to a benefit under subsections (a) to (g) or (h) of this section for any month after August 1950 had he filed application therefor prior to the end of such month shall be entitled to such benefit for such month if he files

Relying on the Act and its regulations, the ALJ denied appellee's claim for benefits back to June 1973, finding specifically that Connelly did not refuse in the June 12, 1974 meeting to allow her to file an application and did not advise her that she had no right to do so. But the ALJ also stated:

> [T]he interviewer did not ask her if she wanted to file an application. When she asked him if she should he responded by advising her she was not eligible. She testified she was not given a form by the interviewer, nor did he suggest or encourage her to file one and he didn't explain the advantages of filing an application.

The ALJ found as a matter of law that she failed to comply with the statutory and regulatory requirements for filing of a written application as prescribed in 42 U.S.C. § 402(g)(1)(D),[4] and (j)(1),[5] and 20 C.F.R. § 404.601.[6] He also held that the oral contact made by the claimant on June 12, 1974 could not be considered to satisfy the requirements for filing a written application, either as a matter of law or on the basis of equitable estoppel. He was upheld by the Appeals Council.

The district court reversed, concluding that appellee asked to complete an applica-

tion but was denied that opportunity. In this case, the court held, the regulation requiring application in writing was "unreasonably restrictive," especially since the Social Security Claims Manual explicitly directed SSA employees to inform applicants of the advantage of filing an application and to suggest filing even in cases of doubtful eligibility. In so holding the court referred to *Tuck v. Finch*, 430 F.2d 1075, 1077 (4th Cir. 1970), *Leimbach v. Califano*, 450 F.Supp. 245, 246, (E.D.Mo.1978), and *Holmes v. Weinberger*, 423 F.Supp. 149, 152–54 (E.D.N.Y.1976).

Section 202(g) of the Social Security Act, 42 U.S.C. § 402(g), *see* note 1 *supra*, provides the conditions of entitlement for mother's insurance benefits. It requires in subsection (1)(D) that the claimant be someone who "has filed application." *See also* § 202(a)–(h), 42 U.S.C. § 402(a)–(h) (containing the same language). The filing of some sort of application is accordingly a condition precedent to entitlement to benefits under this section. *E. g. Clark v. Celebrezze*, 344 F.2d 479, 481 (1st Cir. 1965).

■ Until 1955, Social Security regulations allowed for oral applications. *See*

application therefor prior to the end of the twelfth month immediately succeeding such month.

4. *See* note 1 *supra*.

5. *See* note 3 *supra*.

6. 20 C.F.R. § 404.601 provides:

(a) *Claimant defined.* The term "claimant" for purposes of this subpart refers to the individual who has filed on his own behalf, or on whose behalf a proper party under § 404.-603 has filed, an application for monthly benefits, a lump-sum death payment, the establishment of a period of disability, entitlement to hospital insurance benefits, or special age 72 payments.

(b) *Applicant defined.* The term "applicant" for purposes of this subpart refers to the individual who has filed an application on his own behalf or on behalf of another for monthly benefits, a lump-sum death payment, the establishment of a period of disability, special age 72 payments, or entitlement to hospital insurance benefits.

(c) *Application defined.* Unless otherwise specified, the term "application" refers only to an application on a form prescribed in

§ 404.602 and includes an application for monthly benefits, a lump-sum death payment, the establishment of a period of disability, special age 72 payments, and entitlement to hospital insurance benefits.

(d) *Filing of application on prescribed form.* Except as provided in §§ 404.611, 404.613, and 404.614, an individual has not "filed an application" for purposes of sections 202, 216(i), 223, 226, or 228 of the Act until an application on a form prescribed in § 404.602 has been filed in accordance with the provisions of this Subpart G.

(e) *Execution of application, written statement, requests, or notice; defined.* The term "to execute an application" (or a written statement, request, or notice (see §§ 404.610 and 404.613)), means the completion and signing of the application (or written statement, request, or notice). Irrespective of who may have completed the items on the application (or written statement, request, or notice), the document is considered to have been executed by or on behalf of such claimant when it is signed by the claimant (or an individual authorized to do so on his behalf under § 404.603).

*Holmes v. Weinberger, supra,* 423 F.Supp. at 153; *Johnson v. Hobby,* 131 F.Supp. 497, 499 (D.R.I.1955). Since 1955, however, the regulations implementing the "has filed application" requirement have specifically provided for applications in written form. 20 C.F.R. § 404.601(c). The regulation requiring a written application is valid on its face, particularly in light of the fact that the statute allows for delays in applying by making benefits retroactive for a year prior to the filing of the application. 42 U.S.C. § 402(j).[7] The purpose of this regulation is stated in *Goff v. Weinberger,* No. H 74–276 (D.Conn., Oct. 17, 1975), *aff'd mem.,* 538 F.2d 309 (2d Cir.), *cert. denied,* 429 U.S. 896, 97 S.Ct. 258, 50 L.Ed.2d 179 (1976):

> The Social Security Act, supplemented by its regulations, was intended to eliminate or at least reduce to a minimum the possibility of fraud, confusion and laxity in its administration. The vastness of the program makes it essential to adhere to the written application procedure, if there is to be an orderly and controllable system of management for approving claims and paying out insurance benefits.

*See also Leimbach v. Califano,* 596 F.2d 300, 304 (8th Cir. 1979), reversing the most recent of the decisions relied upon by the district court below, *Leimbach v. Califano,* 450 F.Supp. 245 (E.D.Mo.1978). Thus there is no doubt that the regulation requiring a written application is valid as " 'reasonably related to the purposes of the enabling legislation.' " *Mourning v. Family Publications Service,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973) (citing cases).

■ Here the court below, like the court in *Holmes v. Weinberger, supra,* disregarded the regulation in a particular case. *See also Tuck v. Finch, supra.* Courts are not, however, empowered to disregard valid implementing regulations in particular cases whenever their application appears to be somewhat unfair or particularly onerous. This ground of decision is therefore not available to us. *See Leimbach v. Califano, supra,* 596 F.2d at 304.

■ But this does not end the matter. The Government may sometimes be estopped from enforcing its rules, based on the conduct of its agents. Here, the ALJ specifically concluded that "[t]he evidence indicates that Mr. Connelly did not refuse to give the claimant an application form or refuse to allow her to file an application," and this finding is supported by substantial evidence. *See Franklin v. Secretary of HEW,* 393 F.2d 640, 642 (2d Cir. 1968). But the ALJ's narrative also includes the following: "[T]he interviewer did not ask her if she wanted to file an application. When she asked him if she should, he responded by advising her she was not eligible." This finding surely is supported by the claimant's testimony, set out above. This may not amount to a "refusal" to accept a written application, but it surely is conduct by the claims official deterring the filing of a written application. The question thus becomes whether the Government is estopped in this specific situation, which falls short of intentional deception but does constitute affirmative misinformation.

It may well be, as the Government argues and the Appeals Council found, that this misinformation resulted from appellee's failure to tell Connelly that her former husband was dead, since this fact was a prerequisite of her eligibility. It could also be that, as the amendment affording benefits to appellee was relatively new, Connelly was unfamiliar with it.

■ Regardless of these possibilities, internal department procedures indicate that the Field Agent's actions were improper. Presumably to take into account the possibility of a failure of communication between the prospective applicant and the representative, the Claims Manual guiding such matters indicates that the individual "should be fully informed of the application requirements and the advantages of filing," and that it will be appropriate to suggest to the individual that he file an application, resolving "any doubtful situation in favor of suggesting that the individual file." So-

---

7. *See* note 3 *supra.*

cial Security Claims Manual ¶ 2003. More importantly it specifically advises the claims official in no uncertain terms: "Do not deter an individual from filing solely on the basis that he is not eligible . . . . This is true even where he is clearly ineligible." These things Connelly did not do. It is true that the Claims Manual does not have by its own terms "the force or effect of law." It is not a regulation. It was not published as such in the *Federal Register*. But these facts are not conclusive in this case.

■ Until recently, it was a rubric that the Government cannot be estopped. *E. g.*, *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). Professor Davis points out, however, that the law has changed and "the doctrine of equitable estoppel does apply to the government" as a result of the "almost uniform support of decisions of the 1970s." K. Davis, *Administrative Law of the Seventies*, § 17.01, at 399 (1976). The question has usually arisen in context where the claimant was substantively ineligible for the claimed benefit. *Merrill* itself involved substantive ineligibility for crop insurance based on a regulation making such insurance unavailable for reseeded winter wheat. 332 U.S. at 385, 68 S.Ct. at 3. This court's decision in *Goldberg v. Weinberger*, 546 F.2d 477 (2d Cir. 1976), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2648, 53 L.Ed.2d 255 (1977), involved the unavailability of disability benefits to a disabled widow who had disqualified herself by remarrying before age 60. And in *Corniel-Rodriquez v. INS*, 532 F.2d 301 (2d Cir. 1976), a woman had been denied her immigrant visa because she married. In such cases, a distinction is often drawn between a mere failure to provide accurate information, which will not give rise to estoppel, and "affirmative misconduct" by a Government official, which may do so. *See id.* at 307; K. Davis, *supra*, §§ 17.03 and 17.04 (Supp.1978). This distinction was given slight support by the Supreme Court in *INS v. Hibi*, 414 U.S. 5, 8, 94 S.Ct. 19, 21–22, 38 L.Ed.2d 7 (1973) (per curiam) ("While the issue of whether 'affirmative misconduct' on the part of the Government might estop it from denying citizenship was left open in *Montana v. Kennedy*, 366 U.S. 308, 314, 315 [, 81 S.Ct. 1336, 1340, 1341, 6 L.Ed.2d 313] (1961), no conduct of the sort there adverted to was involved here.").

Here, as our previous discussion indicates, there was no finding of "affirmative misconduct," if that term is defined to mean intentional violation of a rule having the force of law. But here we are talking about a procedural requirement: the necessity of filing a written as opposed to an oral application. Appellee was at all times "substantively" eligible in the sense that she was in the class of people that Congress intended to benefit. It would fulfill the fundamental legislative goal to grant appellee the benefits she seeks. It is no answer to say that a written application is a condition precedent to entitlement, as the Eighth Circuit did in *Leimbach v. Califano, supra*, 596 F.2d at 302; we assume, as we have said, that that is the case, but the question we are discussing is whether the Government should be estopped here from insisting upon compliance with this essentially procedural requirement as to the claim for retroactive benefits. *Leimbach* itself did not decide the estoppel issue on that ground: it simply decided that there had to be "affirmative misconduct" and, in a case with facts quite close to the present ones, found no such misconduct. No argument was made along the lines we here suggest—that there is a distinction between substantive ineligibility, on the one hand, and the fulfillment of a procedural requirement by a person who is substantively eligible on the other. In our view, at least in the latter case, misinformation provided by a Government official combined with a showing of misconduct (even if it does not rise to the level of a violation of a legally binding rule) should be sufficient to require estoppel. We conclude that, here, the Field Representative's statements and conduct were sufficient to create an estoppel as to procedural requirements. Misinformation was clearly given to appellee. As for misconduct, the Claims Manual has relevance since

it does indicate what is proper conduct of local office personnel. Moreover, the local officer's own record of events, as in *Tuck v. Finch, supra,* 430 F.2d at 1077, tends to support the proposition that he was acting hastily and contrary to the Manual. He was proceeding on the assumption, according to his own notation, that this was a "post adjudication matter." Surely the uninformed would-be applicant cannot have been talking along the lines of a "post-adjudication matter" because she had had so far as appears no previous contact with the agency.

 Appellant argues that the reliance of appellee on Connelly's statement that she was ineligible has to be "justifiable," citing *Brown v. Richardson,* 395 F.Supp. 185, 191 (W.D.Pa.1975). The argument is that appellee did not justifiably rely because she "had been told by an attorney that he believed that she was eligible," Gov't Brief at 19, and instead chose to rely on her understanding of the representations of a Social Security Field Representative. Appellant also points out the fact that the claimant did nothing between June of 1974 and May of 1975 and specifically did not consult with the same attorney. But the appellee believed the Field Agent, and her lawyer had only told her that "he thought that probably I was illegible (sic)" and that "if he was me he would go up to the office and apply." This sounds to us like very informal advice—the kind of small-town country-lawyer advice that was written about so well in the Arthur Train stories. It involved no formal written opinion, probably little or no fee, very little research and a certain unfamiliarity with the law as indicated by the "probably" and the conditional suggestion "if he was me." Having received the word "straight from the horse's mouth," that is, from the Social Security Field Representative who at the local level represents the whole force and authority of the United States Government, the applicant cannot be faulted for continuing to think that she was

ineligible or for not going back to her attorney. It was only by chance that she discovered her eligibility when she received a booklet in the mail and then called the Social Security "Enterprise" number and received confirmation.

Accordingly, we hold that appellee did justifiably rely on the Government's conduct, which we have held was unjustifiable. We emphasize that our holding of estoppel under these circumstances is limited to the situation where (a) a procedural not a substantive requirement is involved and (b) an internal procedural manual or guide or some other source of objective standards of conduct exists and supports an inference of misconduct by a Government employee.

Affirmed.

FRIENDLY, Circuit Judge, dissenting:

By dispensing with compliance with an admittedly valid regulation, 20 C.F.R. § 404.601(d), which requires a written application on the appropriate form for a wide variety of social security benefits, the majority opens the door of the federal fisc not simply to Mrs. Hansen, whom we at least know to have visited the HEW office and said something, but to thousands who merely will make a detailed claim that they have done so and whom there is no effective means of rebutting. Millions of dollars will have to be expended simply to ascertain whether conditions of eligibility claimed in a subsequent written application existed at the time of the alleged oral one.[1] And all this because a minor HEW official has not followed a housekeeping rule that he suggest the filing of an application even though he considers the claim to be without merit, as may well have been true in this case on the facts before him.

A controlling decision of the Supreme Court has established for more than three decades that all courts must "observe the conditions defined by Congress for charging

---

1. Judge Newman's concession, fn. 10, that where expensive investigation would be required, "the appropriateness of an estoppel might be tenuous, indeed" points to another

defect of the majority opinions—namely, that they fail to furnish a workable rule that can be readily understood and economically employed.

the public treasury." *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). The claimants in *Merrill* had a far more appealing case than Mrs. Hansen's desire to have the benefits that will be paid her in any event start from a year before her oral application rather than a year before her written one as the regulation provides. A committee acting as agent for the Federal Crop Insurance Corporation affirmatively advised the Merrills that the whole of their proposed crop of spring wheat would be insurable, whether planted on reseeded winter wheat acreage or not. So it could have been under the governing statute, but valid regulations issued by the Corporation provided no protection for spring wheat planted on reseeded winter wheat acreage. The bulk of the Merrills' crop was so planted and perished. Insurance benefits were held to have been properly denied. Unlike the Merrills who committed themselves irretrievably to costly mistaken action on the basis of clearly erroneous advice, the most that can be said here is that, through what could have been entirely proper advice on the facts communicated to the field agent, Mrs. Hansen left the Social Security Office without having filed the written application essential to start the running of a retroactive year's benefit period—action she was free to alter the next day.

In the thirty two years since *Merrill* no Supreme Court decision has gone counter to what that case has held. While some courts and commentators have sought to find a contrary indication in *Moser v. United States*, 341 U.S. 41, 47, 71 S.Ct. 553, 556, 95 L.Ed. 729 (1951), this is an instance of the wish being father to the thought. The four survivors of the *Merrill* majority joined in *Moser*; decision was placed on the ground that a claim to citizenship could be relinquished only be intelligent waiver, which Moser had not done; *Merrill* was not cited; and the opinion expressly said, "There is no need to evaluate these circumstances on the basis of any estoppel of the Government or the power of the Swiss Legation to bind the United States by its advice to petitioner."

*Montana v. Kennedy*, 366 U.S. 308, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961), refused, under the most poignant circumstances, to prevent the Government from asserting that Montana's birth had occurred outside rather than within the United States solely because of the misconduct of a federal official. Montana had been born in Italy of an Italian father and American mother, left Italy that same year with his mother for the United States, and had resided continuously in the United States for 55 years. The Court interpreted then applicable citizenship laws to the effect that Montana was not an American citizen because of his foreign birth. Montana argued that the United States should not be permitted to rely on the fact of his foreign birth because his mother, when pregnant with him, had tried to leave Italy for the United States, but was denied a passport by an American Consular Officer because of her pregnant condition, although in fact neither the United States nor Italy required a passport for United States citizens to return to America. Conceding the serious error, Justice Harlan nonetheless held that this action by a Government official "falls far short of misconduct such as might prevent the United States from relying on petitioner's foreign birth," and added that "In this situation, we need not stop to inquire whether, as some lower courts have held, there may be circumstances in which the United States is estopped to deny citizenship because of the conduct of its officials." *Id.* at 314–15, 81 S.Ct. at 1341. If the giving of such misinformation to Mrs. Montana, resulting in her failing to exercise a right to return to her native land, with the consequence that her son who subsequently resided here for 55 years was denied American citizenship, fell "far short" of what was needed even to trigger inquiry, what are we to say of a situation where the head and front of the offending was an official's failure to press an application into Mrs. Hansen's hand?

The last of the series of Supreme Court decisions is *INS v. Hibi*, 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973) (per curiam). This involved a Filipino who applied for United States citizenship pursuant to the Nationali-

ty Act of 1940, which provided for naturalization of non-citizens who, like Hibi, served honorably in the United States Armed Forces during World War II. Although Hibi applied 17 years after the expiration of the time limit established by Congress under the Act, he argued that the Government was estopped from relying on the limit because of its "failure to advise him, during the time he was eligible, of his right to apply for naturalization," and its failure to post naturalization officials in the Philippines. *Id.* at 7–8, 94 S.Ct. at 21–22. The Court declined to apply estoppel:

> While the issue of whether "affirmative misconduct" on the part of the Government might estop it from denying citizenship was left open in *Montana v. Kennedy*, 366 U.S. 308, 314, 315 [, 81 S.Ct. 1336, 1340, 1341, 6 L.Ed.2d 313] (1961), no conduct of the sort there adverted to was involved here. We do not think that the failure to fully publicize the rights which Congress accorded under the Act of 1940, or the failure to have stationed in the Philippine Islands during all of the time those rights were available an authorized naturalization representative, can give rise to an estoppel against the Government. *Id.* at 8–9, 94 S.Ct. at 21–22.

The sole Second Circuit authority giving any shade of comfort to the plaintiff is *Corniel-Rodriquez v. INS*, 532 F.2d 301 (2 Cir. 1976).[2] This involved a "young and naive" alien who sought admission to the United States as a "special immigrant". Special immigrants are not subject to the general immigration quotas, and include immigrants from the western hemisphere holding a previously obtained work permit from the Secretary of Labor. Children of individuals who, like plaintiff's father, had already obtained special immigrant visas were not required to have a work permit. By statute, however, they must not be married either at time of application for a visa *or* admission to the United States. A State Department regulation required immigration officials to warn individuals in plaintiff's category that they would be inadmissible if "not unmarried at the time of application for admission." A procedural note implementing the regulation provided that marriageable age applicants were to be given a written warning form informing them that they would become ineligible if they married prior to entry. Plaintiff received a special immigrant visa as an unmarried child of an individual who had been admitted as a special immigrant, but married after receiving his visa and before entry into the United States. The State Department thereupon sought her deportation. Plaintiff and her mother, who had accompanied her when she received her visa, both testified that they were given no warning, either oral or written, as to the consequences of such a marriage. No warning form appeared in plaintiff's INS file, nor was one attached to her visa. The Immigration Judge disbelieved plaintiff's testimony, finding it insufficient to rebut the presumption of administrative regularity. The Board of Appeals held that regardless of what happened at the consulate office, the Government could deport petitioner for failure to comply with the statutory terms of admission.

---

**2.** Judge Newman's citation of *Miller v. United States*, 500 F.2d 1007 (2 Cir. 1974), is unavailing. That case recognized the rule that "the government is not estopped by an *unauthorized* act of one of its agents," *id.* at 1010 (emphasis in original), and ruled against the Government because it considered the Government agent's action, although erroneous, to have been authorized. Further, the case presented a conflict between what the court considered to be two equally valid statutory provisions—the question was simply which one to apply. Here there is no competing statute or regulation permitting Mrs. Hansen to file orally. Finally, *Miller* focused on the "flexible approach" it discerned in 26 U.S.C. § 6532 which, *inter alia*, allows the Government and the taxpayer to extend the limitations period by agreement. See *DeGregory v. United States*, 395 F.Supp. 171, 175 (E.D.Mich.1975). Here, Congress has specifically limited its flexibility for those who fail to file appropriately to an award of up to one year retroactive benefits, which Hansen has received, see *infra*. The other Second Circuit case cited, *Podea v. Acheson*, 179 F.2d 306 (1950), made no mention of estoppel and, contrary to the implication of footnote 3 of the concurring opinion, the Supreme Court did not approve of *Podea* in *Montana* but rather specifically declined to inquire into its correctness.

Assuming that the consular official had not adhered to the mandatory regulations, Chief Judge Kaufman felt this constituted sufficient "affirmative misconduct" under the *Hibi* dictum. He specifically noted that the regulations requiring warnings "carried[d] the force of law [and] must be respected and enforced by the Government," *id.* at 307, and distinguished *Hibi* as not involving any such violation of a regulation with the force of law, *id.* at 307 n. 17. In this respect, as will be seen, our case is like *Hibi* and unlike *Corniel.* In a footnote, the court further carefully restricted its ruling:

> We do not, of course, suggest that noncompliance with any regulation, no matter how minor its impact or importance, will automatically prevent the Government from deporting an illegal alien. Our holding is limited to the extraordinary circumstances before us. *Id.* at 307 n. 18.

The limited nature of the *Corniel* exception was speedily underscored in *Goldberg v. Weinberger*, 546 F.2d 477 (2 Cir. 1976), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2648, 53 L.Ed.2d 255 (1977), which reiterated this circuit's adherence to the *Merrill-Montana-Hibi* rule. Plaintiff was receiving widow's benefits from the SSA, and was told by the SSA that her marriage prior to the age of 60 would reduce but not terminate her benefits. In fact, the relevant statute provided that such remarriage would totally eliminate any widow's benefits, while marriage after age 60 would only effect a reduction in benefits. Plaintiff remarried some two months prior to her sixtieth birthday and all her benefits were cut off. This court rejected her effort to invoke estoppel against the Government:

> The government could scarcely function if it were bound by its employees' unauthorized representations. Where a party claims entitlement to benefits under federal statutes and lawfully promulgated regulations, that party must satisfy the requirements imposed by Congress. Even detrimental reliance on misinformation obtained from a seemingly authorized government agent will not excuse a failure to qualify for the benefits under the relevant statutes and regulations. *Id.* at 481.

Judge Hays noted that the Ninth Circuit had "evinced a willingness to depart from the principle in certain circumstances," but declined to embark this circuit on that course. *Corniel* was distinguished and limited:

> Our decision in *Corniel-Rodriquez v. I.N.S.* . . . is not to the contrary. We held there that estoppel may be invoked against the Government where there is "noncompliance with an affirmatively required procedure . . . ." 532 F.2d at 306–07. We took pains, however, to limit our decision to the specific facts of that case, particularly the fact that the government employee had failed to provide petitioner with a warning *mandated* by federal regulations. *Id.* and n. 18. No such regulation governs Social Security office employees. 546 F.2d at 481 n. 5 (emphasis in original).

Beyond this array of relevant Supreme Court and Second Circuit cases, two very recent decisions of the Eighth and Seventh Circuits are almost precisely in point. *Leimbach v. Califano*, 596 F.2d 300 (8 Cir. 1979), reversed a district court decision relied on by Judge Coffrin below. When Leimbach inquired at a SSA office concerning his children's eligibility for benefits due to his wife's decease, he was erroneously informed that the children were not eligible. Additional oral inquiries over the next five years received the same erroneous response. Leimbach discovered some seven years after his first inquiry that the children were in fact eligible. He applied in writing on the appropriate form for his children who then received benefits retroactive for one year. The Eighth Circuit reversed a district court decision granting the Leimbach children benefits as if they had applied during Leimbach's first visit to the SSA office. Citing the *Merrill* rule, the court said that "courts have uniformly held that estoppel will not lie against the Agency where an applicant has simply received misinformation on which he relied to his

detriment." *Id.* at 304. Noting that the *Hibi* Court had left open the question whether affirmative misconduct by a government official might give rise to an estoppel against the government, and accepting Leimbach's testimony that the agency representative had discouraged his filing an application, the court nonetheless stated that it found "nothing that would amount to affirmative misconduct" and "that at worst Mr. Leimbach was simply misinformed by Social Security employees concerning his children's eligibility. Such action on the part of Agency employees, although regrettable, will not give rise to an estoppel against the government." *Id.* at 305. Despite his general dislike of the principle of no estoppel against the Government, see Administrative Law of the Seventies, § 17.01 at 400 (1976), Professor Kenneth Culp Davis has written very recently of *Leimbach,* "A private party loses by lack of timely filing even though government employees misled him into believing that the filing was not required. The authorities the court cites support the decision, which is important because the pattern so often recurs." 1980 Supplement to Administrative Law Treatise, 109 (1980).

Moreover, since the instant case was argued, the Seventh Circuit has followed *Leimbach* in *Cheers v. Secretary of H.E.W.,* 610 F.2d 463 (7th Cir. 1979). Claimant sustained a severe injury which caused him to become a paraplegic. Since February 1968 he was eligible for disabled children's benefits, but he did not file a written application until April 1976, at which point he was given benefits retroactive for one year. Claimant testified that he and others acting on his behalf had repeatedly inquired orally as to his eligibility for benefits between 1968 and 1975, but that he was consistently and incorrectly told that he was ineligible.[3] The Government, claimant argued, should therefore be estopped to deny benefits because of his failure to file a written application. Acknowledging sympathy with the claimant's plight, the court, speaking through Judge Pell, nonetheless declined to override "the well established principle that estoppel shall not operate against the Government in these circumstances." at 469. See also *Gressley v. Califano,* 609 F.2d 1265, 7th Cir. (1979).

It should be noted that the Social Security officers involved in *Leimbach* and *Cheers* were subject to the same provisions in the Claims Manual on which Judge Oakes so heavily relies. Furthermore, in both cases this provision was violated not once, as here, but several times over many years. Finally, whatever one is to make of the majority's substance/procedure distinction, see *infra,* the sole basis for denying benefits in *Leimbach* and *Cheers* was the same failure to file a written application present in this case.

Even the Ninth Circuit, whose occasional departures from *Merrill* this court has expressly declined to follow, *Goldberg v. Weinberger, supra,* 546 F.2d at 481, see also *N.Y. Athletic Supply Co., Inc. v. United States,* 450 F.Supp. 469, 471 (S.D.N.Y.1978) (Frankel, J.), has recognized limits on the application of estoppel against the Government in cases like this which the majority ignores. In *Santiago v. INS,* 526 F.2d 488 (9 Cir. 1975) (en banc), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976), the court declined to apply estoppel against the Government because "the central complaint of each petitioner is . . . the failure to inform or inquire," *id.* at 493, and such

---

**3.** While the Seventh Circuit noted that there was little factual support for the contention that claimant even communicated with Social Security employees or relied upon misinformation furnished by them, in its estoppel discussion the court assumed *arguendo* that claimant's testimony was accurate. at 468–69; see also *id.* at 468 n. 6. The inability to either credit or rebut a claimant's testimony with any degree of certainty is a common phenomenon in oral application cases, including the present one. See, e. g., *Leimbach v. Califano, supra,* 596 F.2d at 302, n. 2. Knowing that the claimant actually visited the SSA office, as we do here, is of little help in reconstructing the content of the interview. As the *Cheers* court noted, it is precisely such difficulties which "underl[y] and justify the need for regulations that require written applications." at 467—and should discourage the use of estoppel to evade them.

failure to inform did not constitute "affirmative misconduct" as required by the *Hibi* dictum. See also *Oki v. INS*, 598 F.2d 1160 (9 Cir. 1979) (per curiam). Here Mrs. Hansen's complaint also focuses on Connelly's failure to inquire more deeply into her eligibility and to inform her that she should file a written application. *United States v. Ruby*, 588 F.2d 697 (9 Cir. 1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979), indicates that the Ninth Circuit's "affirmative misconduct" limit is two-pronged. The court there declined to estop the Government because the conduct complained of, although affirmative, could not properly be characterized as misconduct. As will be discussed below, it is similarly not clear here that what Agent Connelly affirmatively did, namely to tell Mrs. Hansen that she was ineligible, was "misconduct" of any sort. Even more closely on point is *Simon v. Califano*, 593 F.2d 121 (9 Cir. 1979). An HEW trainee was filling out a benefits application for a claimant. Without asking the claimant if she had any children, the trainee wrote "None" in the answer to the question "How many children do you have who may be eligible for benefits?" The claimant signed the application without reading it. In fact she had two children who were eligible for benefits. When she discovered their eligibility two years later, she sought benefits calculated from the date of her previous application, arguing that the Government should be estopped from denying that the children had

also applied at that time. The court declined to estop the Government, for two reasons, both applicable to the case before us. First, "the trainee was guilty of negligence, but that negligence does not amount to affirmative misconduct." *Id.* at 123. Second, Mrs. Simon's children were awarded benefits retroactive for one year from their filing, as Mrs. Hansen's have, and the court did not believe that the loss of retroactive benefits for another year "is of such magnitude and is so serious that HEW should be estopped from enforcing the express terms of the Act." *Id.*

These decisions have been set forth at some length so that it may be appreciated how far today's decision departs from a solid and well-articulated body of doctrine that funds contributed by all citizens, with definite limitations upon their use, are not to be diverted to a person not within these limitations simply because the Federal Government has not been able to secure perfect performance from its hundreds of thousands of employees scattered throughout the continent. To be sure, the Supreme Court has left open whether a case might arise in which misconduct by a Government official was so egregious as to justify a departure from *Merrill* and we found such a case in *Corniel-Rodriquez.* But the applicability of the *Merrill* principle to run of the mill cases like this has become so well established that *stare decisis* requires a court to adhere to it, however strongly a judge may dislike the result.[4] In fact, it would be

4. *Tuck v. Finch*, 430 F.2d 1075 (4 Cir. 1970), is not a true departure from this line of authority, even if it were correctly decided. Tuck orally inquired about his eligibility for disability benefits and was informed, correctly, that he was ineligible as he had not worked the requisite amount of time prior to disability. Tuck, however, could adjust his self-employment income in tax returns in order to qualify himself, if he did this within three years, three months and fifteen days from the relevant year of self-employment; if Tuck applied during this period, but adjusted his income later, the SSA could change their records accordingly. Tuck's visit to the SSA office was within the period but he did not apply in writing until after it had expired. The court held that the unwritten informal application satisfied the statute and allowed Tuck to qualify himself for disability

benefits. One ground for decision was that Tuck was illiterate. The court pointed out that "[w]hile a written application might be expected from a literate person, an illiterate often can do little other than make an oral request to the official to whom he has been referred." *Id.* at 1077. Beyond this the *Tuck* court seemed confused about the Secretary's regulations. It stated for some unarticulated reason that "[u]se of a form . . . does not appear to be mandatory," and did not cite to 20 C.F.R. § 404.601(d) which clearly made it so. Because of this the case is neither one of "estoppel" or even of misconduct, and the court never used these words or cited any of the relevant cases applying them. The conclusion that *Tuck* is not an estoppel case is fortified by *Montgomery County v. Ball*, 416 F.Supp. 737, 742–44 (D.Md. 1975), vacated on other grounds, 561 F.2d 1120

hard to find a spongier factual launching pad for the majority's takeoff than this.

To begin, we know little of what really happened. Mrs. Hansen's interview with Connelly took place in the spring of 1974. When she testified three years later, she had no accurate memory of the date until Connelly's records revealed it. On her own account of the episode she had revealed to Connelly no details of her marital history save for a claim of divorce from someone and a reference to "two Riegel boys".[5] Connelly, of course, could remember nothing with respect to this particular interview out of thousands he had conducted; this is one of the strong reasons for requiring applications to be in writing. I do not read the ALJ's decision as accepting the claimant's credibility beyond the facts, found by him, that she went to the office with the purpose of filing a written application under the then recently enacted amendment relating to divorced mother's insurance benefits, that she was told she was ineligible, and that she left without having filed a written application. The colorful details are the claimant's, after three years of brooding, and hers alone.[6]

It is undisputed that, under 42 U.S.C. § 402(g)(1), Mrs. Hansen was not entitled to benefits on account of the "two Riegel boys" unless Riegel was dead. She does not claim to have told Connelly anything to that effect, it is not even wholly clear that she then knew it, and Connelly had no reason to conjecture that a man who then would have been only 43 was dead. Connelly's advice as to Mrs. Hansen's ineligibility was thus not wrong on the basis of what he was proved to have known. This would not suffice to create an estoppel even against a private company. See, e. g., *Gladden v. Pargas, Inc.*, 575 F.2d 1091, 1094 (4 Cir. 1978) ("Estopped parties' knowledge, either actual or implied, that the representations were untrue when made" is an essential element of estoppel); *Kenneally v. First National Bank of Anoka*, 400 F.2d 838, 843 (8 Cir. 1968), *cert. denied*, 393 U.S. 1063, 89 S.Ct. 716, 21 L.Ed.2d 706 (1969) (same); *Special Event Entertainment v. Rockefeller Center, Inc.*, 458 F.Supp. 72, 76 (S.D.N.Y. 1978) (same). The majority's frequent talk of Connelly's furnishing "misinformation" is thus wholly misplaced. Nothing in the ALJ's findings suggests misconduct on the part of Connelly and the Reconsideration Branch stated that "it is highly improbable that [Connelly] would have informed Mrs. Hanson [sic] that she was not eligible for benefits on the account of Wallace Riegel if she did in fact meet all the requirements for entitlement to benefits."

Judge Oakes, but not Judge Newman, seeks to find misconduct of the sort he considers sufficient for an application of estoppel against the Government by reference to the provisions of the Claims Manual advising agents to recommend the filing of written applications. This ignores that the Claims Manual was not a regulation having the force of law such as the regulations in *Corniel, supra*, 532 F.2d at 307, but was simply an internal agency handbook, never made the subject of proceedings under 5 U.S.C. § 553 as a regulation would have had to be, and expressly stating that it had no

(4 Cir. 1977), *cert. denied*, 435 U.S. 994, 98 S.Ct. 1644, 56 L.Ed.2d 83 (1978). Although bound by *Tuck*, the district court, citing *Merrill*, flatly stated that "[a] government agency cannot be held responsible for the erroneous statements and representations made by its agents."

5. The claim as ultimately filed in 1975 showed she had married Wallace Riegel, Jr. on August 14, 1954 and divorced him on May 8, 1960, and that she had married James Hansen on November 25, 1961 and divorced him on April 16, 1964. The birth certificates of the Riegel boys show they were born on July 4, 1956 and April

29, 1958. The blanks on the application relating to the date, place and nature of Riegel's death were marked "N.A." and the question "[i]s there a surviving parent (or parents)?" was answered with a check in the "No" box. In fact Riegel had died on February 8, 1967 and was buried by his mother.

6. Mrs. Hansen's mother's brief testimony supported only the assertions that Mrs. Hansen went in to apply for benefits and emerged upset because of Connelly's question concerning her marital status.

legal effect.[7] Clearly it is in the public interest for an agency with over 80,000 employees, making more than 1,250,000 disability determinations alone a year, with 215,300 reconsiderations, see 1 Davis, Administrative Law Treatise § 1.3 (2d ed. 1978), to issue housekeeping instructions to its employees in the interest of uniform, fair and efficient administration. But it is perplexing why an agency that issues such instructions should be held to a higher legal standard of dealing with its clients than one that does not. This is all the more so in view of the fact that within the last year the Supreme Court has so strongly emphasized this very point, *United States v. Caceres*, 440 U.S. 741, 755–56, 99 S.Ct. 1465, 1473–74, 59 L.Ed.2d 733 (1979).[8] Dealing with a failure of the IRS, before undertaking consensual electronic surveillance, to implement safeguards provided in an Internal Revenue Service Manual, beyond those constitutionally or statutorily demanded, the Court said:

> we cannot ignore the possibility that a rigid application of an exclusionary rule

to every regulatory violation could have a serious deterrent impact on the formulation of additional standards to govern prosecutorial and police procedures. . . [S]ince the content, and indeed the existence, of the regulations would remain within the Executive's sole authority, the result might well be fewer and less protective regulations. In the long run, it is far better to have rules like those contained in the IRS Manual, and to tolerate occasional erroneous administration . . than either to have no rules except those mandated by statute, or to have them framed in a mere precatory form.[9]

Similar considerations apply to imposition of civil liability. Here it is far better to have thousands of field agents behaving as the Field Manual instructed them than to put the Government at risk that every alleged failure by an agent to follow instructions to the last detail in one of a thousand cases will deprive it of the benefit of the written application requirement which experience has taught to be essential to the

---

7. "The CM is a compilation of instructions for the use of SSA personnel in claims cases. However, it does not have the force or effect of law, and understanding its instructions presupposes a familiarity with the Act and the regulations."

8. *Caceres* was not new doctrine. See *Sullivan v. United States*, 348 U.S. 170, 172–74, 75 S.Ct. 182, 184, 99 L.Ed. 210 (1954) (Executive Order and Circular Letters from Department of Justice requiring approval of Department before presentation of evidence to grand jury "simply a housekeeping provision of the Department" whose violation had no legal effect); *American Farm Lines v. Black Ball Freight Services*, 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970) (I.C.C. rule specifying contents of application for temporary operating authority under § 210a of the Interstate Commerce Act does not preclude grant of authority to non-complying applicant); *United States v. Lockyer*, 448 F.2d 417, 420–21 (10 Cir. 1971) (defendant taxpayer cannot take advantage of provision in Internal Revenue Audit Technique Handbook and Internal Revenue Manual instructing when revenue agent must suspend investigation on finding an indication of fraud).

9. While the factual circumstances of *Caceres* differ from those of the present case, these differences are not significant so far as the

relevance of the quoted language is concerned. *Caceres* involved a criminal prosecution, but Justice Stevens noted that even in agency adjudications "it seems clear that agencies are not required, at the risk of invalidation of their action, to follow all of their rules, even those properly classified as 'internal'." 440 U.S. at 754 n. 18, 99 S.Ct. at 1473 n. 18. The *Caceres* opinion also noted that the taxpayer had not relied on the IRS Manual provision and that its violation had not affected his conduct. *Id.* at 753, 99 S.Ct. at 1472. This discussion was in the course of determining whether the Due Process clause was violated, however, and no one suggests that Hansen has a constitutional claim. Furthermore, the SSA went to considerable lengths to ensure that the Claims Manual not be considered to create any rights that did not otherwise exist. Not only did the Manual explicitly state that it did not have the force or effect of law, note 7, *supra*, but it also provided that it was never to be cited in any correspondence with the public. Indeed, although open to the public under the Administrative Procedure Act, 5 U.S.C. § 552(a)(2)(C), the Manual provided that it was not to be offered to the public "unless the inquirer specifically wishes to see the CM."

honest and effective administration of the Social Security Laws.[10]

We are told there is a significant distinction between substance and procedure, which apparently has been lost on other courts, since in the latter case Congress really wants the claimant to have the benefit, so that estoppel will advance the substantive purpose whereas refusal to estop will frustrate it. We are thus to ignore the directive of *Merrill* that courts must "observe the conditions defined by Congress for charging the public treasury," 332 U.S. at 385, 68 S.Ct. at 3, because "[t]he only people who will gain from this decision are those who are substantively qualified: those whom Congress intended to receive the benefit." The hollowness of the substance/procedure distinction was exposed long ago in *Guaranty Trust Co. v. York*, 326 U.S. 99, 108, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079 (1945). Congress did *not* wish all those eligible for divorced mother's security benefits to receive them as from the date of their eligibility. It wished such benefits to flow only to those applying for them as prescribed by HEW for a period beginning not earlier than a year before the applica-

tion. This is substance in the sense that it significantly affects the result, not "merely the manner or means by which a right to recover . . . is enforced." *Guaranty Trust Co. v. York, supra*, 326 U.S. at 109, 65 S.Ct. at 1470. The fact that in no event may payment for preapplication benefits exceed one year does not bespeak an overmastering Congressional desire that no eligible applicant shall go unpaid. Thus, the linchpin of Judge Newman's opinion—that Congress intended all those who were eligible to receive benefits—completely fails. There is simply no legitimate basis for a court, pursuing its own ideas of what would be desirable, to isolate one aspect of a governmental program as the "pertinent policy" while relegating other aspects, whether provided by Congress itself or the agency to which Congress has entrusted administration of the program, to some inferior status.

To sum up, no one supports affirmance of the district court's order on the grounds on which it was rested, namely, that the regulation requiring a written application was invalid or that Connelly refused to allow Mrs. Hansen to file one. Affirmance likewise cannot rest on the new ground of

---

10. It is worth noting how small Connelly's violation of the relevant passage of the Claims Manual actually was. This reads:

> 2003. Administrative Policy of Acceptance of Application.
> a) General
> Where an individual is inquiring about possible current entitlement to [Retirement, Survivors (including Mothers') Disability, Health Insurance] benefits, his interests will ordinarily be best served by filing an application immediately so that retroactive title II benefits will be better protected and a determination made on his entitlement. He will also have the right of appeal in the event he is not satisfied with the determination. The individual must make the actual decision of whether or not to file, but he should be fully informed of the application requirements and the advantages of filing. Unless filing is obviously disadvantageous or the question is one of filing for reduced title II benefits only, it will be appropriate to suggest to the individual that he files an application. Resolve any doubtful situation in favor of suggesting that the individual file since he may withdraw his application later if he wishes.
> A delay in filing should never be suggested because there is no doubt as to the inquirer's

eligibility or because extensive development may be necessary. An application should be obtained and development made for a determination. Do not deter an individual from filing solely on the basis that he is not eligible . . . This is true even where he is clearly ineligible. Every inquirer should receive an explanation of the application requirements and an application should be taken if he indicates that he wishes to file. If an individual makes no mention that he wishes to file but is not satisfied with the information about his eligibility, it should be suggested that he file an application so that a determination may be made.

The first two sentences are a description of the applicant's best interest, not an order to the agent. There was no need to inform Mrs. Hansen of the application requirement since she knew all about it. Connelly's breach lay in not advising her or fully informing her of the advantages of filing and suggesting that she file. He did not "deter an individual from filing solely on the basis that he is not eligible." He simply advised, perhaps correctly on the few facts confided to him, that she was not eligible and did not press her to file.

misconduct now brought forward. What Connelly affirmatively told Hansen, namely, that she was not eligible, has never been determined to be misconduct, based on the information provided him; surely it was nothing like the clear affirmative misconduct in *Merrill*. Neither is what Connelly did not tell Hansen, that she should apply in writing though he considered her ineligible, misconduct in any legally relevant sense, as pointed out last term in *Caceres*. Finally the majority is also dispensing with the "affirmative misconduct" prerequisite based on the *Hibi* dictum and our *Corniel* decision, since in no realistic sense can Connelly's failure to encourage Hansen to apply in writing be deemed *affirmative* conduct. The majority is simply disregarding the Supreme Court's decisions in *Merrill, Montana* and *Hibi*, and placing ourselves in square conflict with the decisions of most, indeed probably all other courts of appeals in similar cases—and all this on an exceedingly weak set of facts and a newly found jurisprudential distinction which cannot survive analysis. There are some rules of federal law that had best left unchanged until Congress decides to alter them even when the result is much harsher than here. This is one of them.

The judgment should be reversed with instructions to dismiss the complaint.

NEWMAN, Circuit Judge, concurring:

I concur fully in Judge Oakes' opinion for this Court. I write only to emphasize the importance of that opinion's substantive-procedural distinction as both the explanatory and the limiting principle for our decision upholding estoppel against the Government. Judge Friendly's vigorous dissenting opinion concludes that the case law has generally opposed estoppel of the Government, and that the substance-procedure distinction cannot be maintained in this context. My review of the authorities persuades me that estoppel of the Government enjoys considerable support and that the substance-procedure distinction makes the doctrine especially appropriate in the circumstances of this case.

In *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), the Supreme Court declared that, as a general rule, the Government would not be bound by the incorrect and misleading statements of its agents. See *Utah Power & Light Co. v. United States*, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917). The principal thrust of this decision was that the rules governing the estoppel of private parties were not applicable to the Government, 332 U.S. at 383–84, 68 S.Ct. at 2–3, see *Utah Power & Light Co., supra*, 243 U.S. at 409, 37 S.Ct. at 391, not that an estoppel against the Government was impermissible under any circumstances. The latter point was made explicit in *Montana v. Kennedy*, 366 U.S. 308, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961), where the Court said: "we need not stop to inquire whether, as some lower courts have held, there may be circumstances in which the United States is estopped to deny citizenship because of the conduct of its officials." *Id.* at 315, 81 S.Ct. at 1341 (footnote omitted). Moreover, in *INS v. Hibi*, 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973), the Court cited *Montana* as recognizing one possible circumstance, affirmative misconduct, that might justify estoppel, although it continued to reserve decision on the resolution of this issue.

Thus, the principle of these decisions is that courts must not apply the private law notion of estoppel to the Government and that the more restrictive circumstances under which estoppel of the Government might arise remain to be articulated. The response of the lower courts, while uncertain at times, has been generally consistent with this view.[1] While emphatic rejections

---

1. Judge Friendly's dissent, in discussing some of the leading cases that have imposed estoppel on the Government, suggests that the authority of these cases is limited by the unusual nature of their factual situations, *supra,* at 950–951 (discussing *Corniel-Rodriguez*), *supra,* at 954 n.

4 (discussing *Tuck*). This proves that the cases do not support estoppel of the Government in all possible circumstances, a fact that no one contests. But it also proves that there are some circumstances, varying from circuit to circuit at the present time, in which the

of estoppel against the Government occasionally appear in passing phrases, see *Dix v. Rollins*, 413 F.2d 711, 716 (8th Cir. 1969); *Udall v. Oelschlaeger*, 389 F.2d 974, 977 (D.C.Cir.), *cert. denied*, 392 U.S. 909, 88 S.Ct. 2056, 20 L.Ed.2d 1367 (1968), no court of appeals has ruled that estoppel would be unavailable in all circumstances. On the contrary, no fewer than eight circuits, including this one, have stated that there are some circumstances in which the Government will be estopped.[2] *Corniel-Rodriguez v. INS*, 532 F.2d 301 (2d Cir. 1976); *Walsonavich v. United States*, 335 F.2d 96 (3d Cir. 1964); *Tuck v. Finch*, 430 F.2d 1075 (4th Cir. 1970); *Simmons v. United States*, 308 F.2d 938, 945 (5th Cir. 1962); *United States v. Fox Lake State Bank*, 366 F.2d 962 (7th Cir. 1966); *United States v. Wharton*, 514 F.2d 406 (9th Cir. 1975); *Massaglia v. Commissioner*, 286 F.2d 258, 262 (10th Cir. 1961) (dictum); *Semaan v. Mumford*, 335 F.2d 704, 706 (D.C. Cir. 1964). The principle is particularly well-established in this Circuit. See *Corniel-Rodriguez, supra; Miller v. United States*, 500 F.2d 1007 (2d Cir. 1974); *Podea v. Acheson*, 179 F.2d 306 (2d Cir. 1950) (conclusion that plaintiff's waiver of citizenship was not binding for reason of duress supported by erroneous nature of Government advice to plaintiff);[3] *Tonkonogy v. United States*, 417 F.Supp. 78 (S.C.N.Y.1976). These decisions have not purported to evolve a standard for determining when the Government is estopped. That task requires further analysis of the cases, those that have upheld an estoppel and those that have not.

In *Merrill* the Supreme Court refused to apply the private law notion of estoppel to the Government because the Government's policies, unlike those of a private party, have general social significance. These pol-

icies, the Court reasoned, should not be at the mercy of an errant government official. When a private organization is involved, the only consideration in deciding an estoppel question is the relative equities between that organization and the party whom it has misled. But society has an overarching interest in the substantive policies established by its government. That interest justifies (though reasonable minds might differ as to whether it compels) adherence to those policies, even when the reason a person finds himself outside the scope of the pertinent policy stems in part from conduct of a government official. Even then, estoppel might be available, as the Supreme Court indicated in *Montana* and we held in *Corniel-Rodriguez*, if the governmental conduct on which the claimant relied was affirmative misconduct. See *United States v. Lazy FC Ranch*, 481 F.2d 985 (9th Cir. 1973); *cf. Semaan v. Mumford, supra* (Government estopped from denying employee permanent status after having misled him to believe that such status had been granted). The maintenance of governmental policies need not be so absolute as to perpetuate the myth that the king can do no wrong.

However, when a claimant is within the substantive scope of the pertinent legislative policy, but ineligible because of a procedural default attributable in part to conduct of a government official, the rationale for rejecting estoppel or limiting it to cases of affirmative misconduct disappears. In that situation, public policy favors the granting of the benefit, not its denial. Persons within the class for whom benefits are intended are, of course, normally obliged to follow procedural requirements to establish their entitlement. Procedural requirements, like the written application rule at

---

Government will be estopped. The issue in this case is to determine what those circumstances should be.

**2.** *See* K. Davis, *Administrative Law Text*, § 17.01 at 343 (3d ed. 1972) (sounder position is "that the doctrine of equitable estoppel may apply to the government when justice so requires"); F. Newman, *Should Official Advice Be Reliable?—Proposals as to Estoppel and Re-*

*lated Doctrines in Administrative Law*, 53 Colum.L.Rev. 374 (1953).

**3.** Though *Podea* did not explicitly mention estoppel, as Judge Friendly's dissent points out, the Supreme Court has viewed the case as an instance in which "the United States is estopped." *Montana v. Kennedy, supra*, 366 U.S. at 315 & n.11, 81 S.Ct. at 1341.

issue in this case, serve important interests. But when the failure to observe the procedural requirement is caused by conduct of a government official, an estoppel to prevent the Government from asserting procedural noncompliance means that the substantive legislative policy will be carried out. On the other hand, permitting the Government to precipitate the procedural default and then to assert it as a defense means that the substantive legislative policy will be frustrated.

The decided cases have implicitly observed this distinction. Courts have refused to estop the Government, frequently in circumstances more compelling than those of Mrs. Hansen, when the relief would have conflicted with substantive policies established by Congress. In *Merrill*, two farmers, misinformed by an official that spring wheat planted on reseeded winter wheat acreage was insurable, planted their spring wheat on the winter acreage and were denied crop insurance. In *Montana, supra*, an alien, born abroad when his pregnant mother was incorrectly denied return to the United States, was denied citizenship. In *Goldberg v. Weinberger*, 546 F.2d 477 (2d Cir. 1976), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2648, 53 L.Ed.2d 255 (1977), a woman, incorrectly told by a Social Security official that she could remarry before her sixtieth birthday without losing widow's benefits, did remarry before age 60 and was denied widow's benefits. In each of these cases the consequences confronting the plaintiffs were to some extent attributable to conduct of a government official. But none of the

plaintiffs was substantively entitled to the claimed benefit. The Merrills planted uninsurable wheat, Montana was born abroad, and Mrs. Goldberg remarried before age 60. Moreover, in each instance the basis of ineligibility was related to a substantive public policy. In *Merrill* the policy concerned the reseeding of winter wheat acreage. In *Montana* the policy concerned foreign citizenship resulting from birth abroad. In *Goldberg* the policy concerned the economic needs of widows who remarry before age 60.

In contrast, when conduct of a government official has precipitated a procedural default, courts have refused to permit the Government to assert that default as a defense.[4] In *Miller v. United States, supra*, this Court held that the merits of a taxpayer's refund suit must be considered despite its late filing when the lateness was attributable to erroneous information from a government official. Congress had authorized Miller to contest the merits of his tax dispute, and estopping the Government from relying on procedural default for which it shared some responsibility carried out the Congressional purpose. See *Tuck v. Finch, supra* (Government estopped from denying Social Security benefits for failure to file tax returns showing self-employment income); *Brandt v. Hickel*, 427 F.2d 53 (9th Cir. 1970) (Government estopped from rejecting application for lack of temporal priority); *Walsonavich v. United States, supra* (Government estopped from denying tax refund for failure to file timely refund claim); *Smale & Robinson, Inc. v. United States,*

---

4. Of course, even procedural defaults cannot be excused unless the conduct of a government official bears at least some causal relationship to the procedural non-compliance. *INS v. Hibi, supra*, can be considered to be a case involving a procedural default, the filing 17 years late of a claim for naturalization. But Hibi's claim was that the Government should have undertaken positive steps to inform him of his rights, such as publicizing his rights in the Philippines or stationing an INS official there. In rejecting this claim, the decision did not reject the principle that the Government may be estopped from asserting procedural default; it simply noted the total absence of any conduct on the part of the Government that would have justified an

estoppel even against a private party. The Government risks estoppel by deterring procedural compliance, not by failing to guaranty compliance.

Determining what conduct will suffice to support an estoppel will understandably precipitate various conclusions, as evidenced by the difference between the results in this case and that in *Cheers v. Secretary of HEW*, 610 F.2d 463 (7th Cir. 1979), and *Leimbach v. Califano*, 596 F.2d 300 (8th Cir. 1979). Differing assessments of the significance of particular governmental conduct should not, however, obscure the principle that estoppel is available against the Government in cases involving procedural default.

123 F.Supp. 457 (S.D.Cal.1954) (same); *cf. United States v. Fox Lake State Bank, supra* (Government estopped from penalizing bank from submitting inadequate claim forms).

The Congressional policy pertinent to this case is that a divorced mother of minor children, whose former husband dies after reaching insurable status under the Social Security system, should receive benefits.[5] Mrs. Hansen is indisputably within the class for whom the benefits were intended. Whether or not the conduct of the Social Security official was in breach of an internal office manual,[6] it was conduct that precipitated her procedural default. There is room for reasonable dispute as to what actually happened when Mrs. Hansen visited the Social Security office. But regardless of how this panel might have found the facts, the ALJ, who heard the witnesses, found that when Mrs. Hansen asked if she should file a written application, the Social Security employee "responded" by advising her she was not eligible. Even if he honestly but mistakenly believed she was ineligible, his response was the cause of her not filing.[7] The ALJ, after hearing all the evidence, found facts that would justify an estoppel. He declined to apply one only because he did not believe that the applicable legal principles made an estoppel available.

Judge Friendly argues in dissent that there is no real distinction between substantive and procedural ineligibility because Congress did not want to grant the benefit to a person who fails to file in the manner prescribed by the agency any more than it wanted to grant the benefit to a person who fails to qualify. But there is surely a real difference between these two Congressional commands. The substantive qualifications are the very purpose of the legislation, motivated by major social policy considerations. The procedural requirements are simply a means of implementing that purpose. They are designed to identify eligible individuals and deliver the benefits to them as fairly and efficiently as possible. To reject a qualified applicant because of a procedural defect for which a government official is responsible is to frustrate the purpose of the statute, not to uphold it.

Another objection of Judge Friendly's is that the substantive-procedural distinction is inappropriate in the context of this case because, in the language of *Guaranty Trust Co. v. York*, 326 U.S. 99, 109, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079 (1945), the application requirement concerns substance in the sense that "it significantly affect[s] the result," and does not concern "merely the manner and the means by which a right to recover . . . is enforced."[8] Even in the terms

5. The fact that Congress prescribed an application procedure surely does not detract from the substance of the policy to extend benefits to all who meet the demographic criteria. Congress did not make these benefits available in the secret hope that few of those eligible would apply, much less that some, like Mrs. Hansen, would attempt to apply only to be deflected from that objective by the conduct of a Social Security employee. In a very real sense Congress wants those who meet the substantive criteria to receive their benefits. Why else would it provide funds for an elaborate network of local Social Security offices and spend additional funds to inform the public of Social Security benefits?

6. I agree with Judge Friendly that Connelly's noncompliance with the internal office manual is not a dispositive factor in favor of Mrs. Hansen's claim. Nevertheless, his conduct, however characterized, is sufficient to estop the Government from denying Mrs. Hansen her benefit on the basis of her resulting procedural default.

7. The dissent expresses some concern about the ease with which a claimant may assert that governmental conduct contributed to procedural default, noting the difficulty a bureaucracy will have in rebutting allegations concerning one of many thousand indistinguishable events. But the claimant makes the allegation under oath and subject to cross-examination. Testimony thus given, if accepted by the fact-finder, is sufficient to send people to prison, even when the witness stands to gain far more than a Social Security benefit. No fact-finding process can preclude error, but the risk of occasionally failing to detect a lie should not deny benefits to those who tell the truth.

8. It is somewhat surprising to see matters classified as substantive because they significantly affect the result. That outcome-determinative test, subsequently applied by the Supreme

of *Guaranty Trust*, a requirement that benefits be applied for in writing seems closely analogous to the "means by which a right to recover . . . is enforced." But more significantly, the most enduring teaching of *Guaranty Trust* is that the terms "substance" and "procedure" do not have constant meanings in all contexts. "Each implies different variables depending upon the particular problem for which it is used." *Id.* at 108, 65 S.Ct. at 1469. In the context of determining when it is appropriate to consider the Government estopped by the conduct of its agents, the distinction can sensibly be drawn between substantive policy, which concerns definition of the class to whom benefits are extended, and procedure, which concerns the method by which any one person establishes eligibility. There may well be reasons why Congress would not want benefits extended to those not substantively eligible, even if governmental conduct contributed to ineligibility, but it is hard to imagine why Congress would want benefits denied to a person for whom the benefits are intended when governmental conduct has been a cause of that person's failure to make proper application.

Judge Friendly also voices the concern that permitting estoppel in these circumstances will create a drain upon the public treasury. Perhaps this would be true if estoppel were permitted to provide benefits to those who fail to meet the substantive requirements of the statute, but the rule applied in this case entirely avoids that danger. The only people who will gain from this decision are those who are substantively qualified: those whom Congress intended to receive the benefit. Such people cannot truly be a drain upon the public treasury, since they should have received the money in the first place. The actuarial estimates that determine the funding levels of the Social Security trust funds are based primarily on demographic facts. The rate at which Mrs. Hansen's deceased former husband and his employer made social security payments was set at a level sufficient to provide benefits for those like Mrs. Hansen who are substantively eligible for them. It is possible to imagine, though difficult to believe, that the actuarial estimates took into account the anticipated percent of eligible persons who would fail through ignorance, laziness or other cause unrelated to the conduct of Social Security personnel to file written applications.[9] But it is not even imaginable that an estimate was made of the number of eligible persons who would appear at Social Security offices inquiring about the filing of written applications only to be deterred by an employee's misinformation as to their eligibility and his failure, contrary to office instructions, to encourage the filing of a written application. The point is that this decision does not drain the public fisc of one dollar that is being spent either in excess of anticipated benefit levels or contrary to a substantive policy decision of the Congress.

Of course impact upon the public fisc is not irrelevant to this or any other case where monetary claims are asserted against

Court to decide the reach of the Federal Rules of Civil Procedure in diversity cases, *e. g., Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); *Ragan v. Merchants Transfer & Warehouse Co.*, 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 1520 (1949), has since been modified, *Byrd v. Blue Ridge Rural Electric Cooperative, Inc.*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), and later substantially eroded, *Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), even in the context of choosing between federal and state law. As Professor Wright has observed, "It is difficult to conceive of any rule of procedure that cannot have a significant effect on the outcome of a case." C. Wright,

Handbook of the Law of Federal Courts 273 (1976).

9. In fact, the basic document of the Social Security Administration describing the actuarial methodology for the entire Old-Age, Survivors, and Disability Insurance System omits any reference to an estimate of eligible beneficiaries who fail to apply for benefits. "Methodology Involved in Developing Long-Range Cost Estimates for the Old-Age, Survivors, and Disability Insurance System," Actuarial Study No. 49, U.S. Department of Health, Education, and Welfare, Social Security Administration, Division of the Actuary (May 1959).

the Government. The dissent's apprehension about the cost of ascertaining the facts of eligibility in the absence of a written application has undeniable force as a general principle. But it has no application to this case. To establish her eligibility Mrs. Hansen needed proof that she married and later divorced her former husband, that he is dead, that he has minor children who are the offspring of that marriage, and that he had insured status. The last-mentioned fact is entirely within the knowledge of Social Security, and the first three, properly to be proved by her, are not in dispute, nor has any claim been made that the Government has been put to any expense to verify these facts. Mrs. Hansen is indisputably a member of the class for whom the benefits were intended and paid for, and no hardship or expense has been sustained by the Government in determining that fact.[10]

Estopping the Government from reliance on a procedural default is especially appropriate in the context of a program like Social Security. It is designed to confer benefits to millions of people who are not expected to need legal advice to present their claims. Moreover, the system is administered by a vast network of local offices for the very purpose of assisting individuals to obtain their benefits. I concur not because the amount of money Mrs. Hansen seeks is small, but because it is only fair that it be paid.

10. If a case arises where the absence of a written application, even though attributable to conduct of the Government, would necessitate considerable expense to ascertain the facts concerning eligibility, the appropriateness of an estoppel might be tenuous indeed.