MATTER OF M/V "RUNAWAY"

In Fine Proceedings

MIA 10/12.12

*Decided by Board October 2, 1981*

(1) Section 273(a) of the Immigration and Nationality Act, 8 U.S.C. 1323(a), in effect, makes the carrier of aliens an insurer that his passengers have met the visa requirements of the Act.

(2) Cuban nationals who came to the United States in the "Freedom Flotilla" of 1980 without first having filed Form I-590 (Registration for Classification as a Refugee) and having received approval for admission as refugees under section 207 of the Act, 8 U.S.C. 1157, are not exempt from the Act's visa requirements by virtue of the provisions of the Refugee Act of 1980.

(3) Since liability for fines under section 273(a) of the Act is determined as of the time the aliens are brought to the United States, it does not matter whether the aliens are subsequently admitted to the United States by the Attorney General.

(4) Reasonable diligence within the meaning of the remission provisions of section 273(c) of the Act is not established by carrier's statement that he relied on a presidential "open hearts and open arms" speech in deciding to go to Cuba where the evidence shows that he departed for Cuba prior to the speech and where the presidential speech cannot be reasonably construed as a waiver of visa requirements or as authority for bringing undocumented aliens to the United States.

(5) Reasonable diligence within the meaning of the remission provisions of section 273(c) of the Act is not established where the evidence does not support carrier's allegation that he believed that the visa requirements were waived under the Refugee Act of 1980.

(6) Reasonable diligence within the meaning of the remission provisions of section 273(c) of the Act is not established where carrier's only evidence in support of his contention that he relied on announcements of the Immigration and Naturalization Service and other federal agencies in deciding to go to Cuba was an affidavit which was factually insufficient and, therefore, not credible.

In re: M/V "Runaway", which arrived at Key West, Florida, from Cuba on May 14, 1980. Alien passengers involved: Tapia Martin Villa, Demegret Maria Sanchez, Dupetron Gerardo Morejon, Gonzalez Quiniana, Campan Armando Ibarra, Moreno Leonaldo Moreno, et al.

BASIS FOR FINE: Act of 1952—Sec. 273 [8 U.S.C. 1323]—Bringing to the United States immigrants not in possession of unexpired visas

ON BEHALF OF CARRIER: Leonard F. Mikul, Esquire
Mikul & Mikul
403 Whitehead Street
Key West, Florida 33040

By: Milhollan, Chairman; Maniatis, Maguire, Morris, and Vacca, Board Members

On February 2, 1981, the District Director in Miami imposed administrative fines totalling $5,000 upon Russell K. Sprague, captain/owner of the M/V Runaway (hereafter referenced as the "carrier"), for five violations of section 273(a) of the Immigration and Nationality Act, 8 U.S.C. 1323(a). The District Director also determined that the carrier had not met the requirements for remission of the fines. The carrier has appealed. The appeal will be dismissed.

The record reflects that the carrier departed from the United States on or about April 25, 1980, bound for Cuba for the purpose of picking up five Cuban nationals and returning with them to the United States. It further reflects that the carrier returned from Cuba to Key West, Florida, on May 14, 1980, with twelve alien passengers, two of whom he had intended to pick up and ten of whom were allegedly forced upon his boat by Cuban authorities. None of the twelve aliens was in possession of a valid unexpired visa or other entry document. A Notice of Intention to Fine was served upon the carrier upon his arrival in Key West. The carrier filed a written defense with affidavits and appeared for a personal interview on September 26, 1980. An immigration officer found the carrier subject to fines under section 273 of the Act for twelve violations. However, he recommended that the District Director exercise his prosecutorial discretion and impose the statutory $1,000 per alien fine only with respect to five of the twelve aliens on the theory that the carrier should be fined only for the number of aliens he had originally intended to bring to the United States. The District Director accepted that recommendation.

The statute under which the fines were imposed in this case is clear. Section 273(a) of the Act provides: "It shall be unlawful for any person . . . to bring to the United States from any place outside thereof . . . any alien who does not have an unexpired visa, if a visa was required under this Act or regulations issued thereunder." Section 273(b) provides that the fine for each violation of subsection (a) shall be $1,000. Section 273(c) provides: "Such sums shall not be remitted or refunded, unless it appears to the satisfaction of the Attorney General that such person . . . prior to departure of the vessel or aircraft from the last port outside of the United States, did not know, and could not have ascertained by the exercise of reasonable diligence, that the individual transported was an alien and that a visa was required."

We have held that section 273(a), in effect, makes the carrier of aliens an insurer that his passengers have met the visa requirements of the Act and that any bringing to the United States of an alien who does not meet these requirements incurs liability. *Matter of M/V "Emma"*, 18

I&N Dec. 40 (BIA 1981); *Matter of Swissair, "Flight #164"*, 15 I&N Dec. 1 (BIA 1974). We have also noted that there is no provision for mitigation of such fines. However, section 273(c) permits remission (forgiveness in full) in one circumstance: where it appears that prior to the alien's departure from the last port outside the United States, the carrier did not know, and could not have ascertained by the exercise of reasonable diligence, that the individual transported was an alien or that a visa was required. What constitutes "reasonable diligence" varies according to the circumstances of the case. *Matter of S.S. "Florida"*, 3 I&N Dec. 1 (BIA 1947, 1948; A.G. 1948).

The carrier contends that he is not liable for fines under section 273 of the Act because his passengers were refugees and the visa requirements for refugees are waived by the Refugee Act of 1980. He also argues that he is not liable for the fines because he was coerced by the Cuban government into bringing ten of the twelve aliens to the United States. Finally, the carrier contends that he is entitled to have the fines remitted because he has established that he exercised reasonable diligence under section 273(c) of the Act.

A brief review of the current statutory and regulatory provisions governing the admission of refugees will be helpful in understanding the carrier's first argument. In the Refugee Act of 1980,[1] Congress provided two forms of relief for a limited number of aliens who could meet the definition of "refugee" set forth in section 101(a)(42) of the Act. Section 207 of the Act,[2] among other things, provides that the Attorney General may, in his discretion and pursuant to such regulations as he may prescribe, admit certain refugees to the United States. Section 208

---

[1] Public Law 96-212, 94 Stat. 102 (effective March 17, 1980). References to sections of the Act refer to the Immigration and Nationality Act as amended by the Refugee Act of 1980.

[2] Section 207 of the Act provides:

(a)(1) Except as provided in subsection (b), the number of refugees who may be admitted under this section in fiscal year 1980, 1981, or 1982, may not exceed fifty thousand unless the President determines, before the beginning of the fiscal year and after appropriate consultation (as defined in subsection (e)), that admission of a specific number of refugees in excess of such number is justified by humanitarian concerns or is otherwise in the national interest . . . .

. . . .

(c)(1) Subject to the numerical limitations established pursuant to sections (a) and (b), the Attorney General may, in the Attorney General's discretion and *pursuant to such regulations as the Attorney General may prescribe*, admit any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible (except as otherwise provided under paragraph (3)) as an immigrant under this Act.(Emphasis added.) . . . .

(c)(3) The provisions of paragraphs (14), (15), (20) . . . of section 212(a) shall not be applicable to any alien seeking admission to the United States under this subsection, and the Attorney General may waive any other provision of such section . . . .

of the Act[3] permits the Attorney General, in his discretion, to grant asylum to refugees who are "physically present in the United States. . . ."

The regulations[4] implementing section 207 of the Act provide that admission to the United States as a refugee may be sought by "filing Form I-590 (Registration for Classification as a Refugee) with the overseas Immigration and Naturalization Service officer in charge responsible for the area where the applicant is located . . . ." 8 C.F.R. 207.1. 8 C.F.R. 207.2 provides for the processing of the application and section 207.4 provides that the approval of an application by an officer in charge outside the United States authorizes the District Director of the port of entry to conditionally admit the applicant as a refugee upon his or her arrival at such port within 4 months after the date of approval of the Form I-590. It also specifies that there is no appeal from the denial of refugee status.

The carrier's first argument is that he is not liable for fines under section 273 because his passengers were not required to have visas because they were refugees. He contends that the requirement for a refugee to have a visa is waived by sections 207(c)(3) and 211(c) of the Act. With regard to the first of these sections, the carrier reasons that the visa requirement of section 212(a)(20)[5] is not applicable to his passengers because they are "seeking admission to the United States" as refugees within the meaning of section 207(c)(3) of the Act.[6]

The error of the carrier's reasoning is that section 207 is not applicable in this case. There is no provision in the Act or the regulations promulgated thereunder which authorizes an alien physically present in the United States to seek admission under section 207. On the contrary, the regulations provide that an application for admission as a refugee must be filed with an Immigration and Naturalization Service officer in

---

[3] Section 208 of the Act provides:

The Attorney General shall establish a procedure for an alien *physically present in the United States or at a land border or port of entry*, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 101(a)(42)(A) (Emphasis added.) . . . .

[4] Interim regulations published on June 2, 1980 (45 Fed. Reg. 37392), effective June 1, 1980, were made final as amended by final rules published on September 10, 1981 (45 Fed. Reg. 45116), effective October 12, 1981.

[5] Section 212(a)(20) provides:

(a) Except as otherwise provided in this Act, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

(20) Except as otherwise specifically provided in this Act, any immigrant who at the time of application for admission is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this Act . . . .

[6] Section 207(c)(3) is quoted in note 2, *supra.*

charge overseas. 8 C.F.R. 207.1. Refugees who are "physically present in the United States or at a land border or port of entry" may obtain refugee status only through the asylum procedure of section 208 of the Act. As the carrier's passengers are not "overseas", but have come to the United States and have been granted parole, they are physically present in the United States vithin the meaning of section 208 and, thus, are ineligible to seek admission as refugees under section 207 of the Act. Moreover, we have held that Cuban nationals who came to the United States in the "freedom flotilla" to apply for admission as refugees are excludable from the United States under section 212(a)(20) of the Act for lack of valid unexpired visas. *Matter of Castellon*, 17 I&N Dec. 616 (BIA 1981). Thus, the waiver provisions of section 207(c)(3), cited by the carrier, are of no benefit to him.

The carrier's contention that the visa requirements of section 211(a) of the Act are waived for his passengers by section 211(c)[7] is also without merit. By its own terms, the visa requirement of section 211(a) is inapplicable under section 211(c) only with respect to aliens "whom the Attorney General admits to the United States under section 207." There is no evidence, or even an allegation, that the Attorney General has admitted any of the carrier's passengers to the United States under section 207. Therefore, at the time of arrival in the United States, the carrier's passengers were required by sections 211(a) and 212(a)(20) to have visas for admission into the United States. Furthermore, it matters not for purposes of liability for fines under section 273 of the Act if the Attorney General eventually admits the carrier's passengers because they were not admissible to the United States at the time he brought them here unless they had visas and none of them had visas. *Peninsular and Occidental Steamship Company* v. *United States*, 242 F.2d 639 (5 Cir. 1957).

In addition to the technical deficiencies in the carrier's argument discussed above, there are strong policy reasons for rejecting it. Carriers were first made liable for bringing to the United States immigrants without visas in the Immigration and Nationality Act of 1924, 43 Stat. 153. This provision was designed to discourage the bringing to the United States of an immigrant[8] who had not received a visa prior to his or her

---

[7] Section 211 provides:

(a) Except as provided in subsection (b) and subsection (c) no immigrant shall be admitted into the United States unless at the time of application for admission he (1) has a valid unexpired immigrant visa or was born subsequent to the issuance of such visa of the accompanying parent . . . .

. . . .

(c) The provisions of subsection (a) shall not apply to an alien whom the Attorney General admits to the United States under section 207.

[8] This provision was expanded to include nonimmigrants in the Immigration and Nation-

departure for the United States. It is and has been considered an important weapon in the enforcement of our immigration laws. Gordon and Rosenfield, *Immigration Law and Procedure*, Section 9.12 (1979). The construction of sections 207(c)(3) and 211(c) of the Act offered by the carrier would greatly undermine this enforcement objective. In the broadest sense, it would permit a carrier to circumvent section 273 of the Act in any case by simply having his undocumented passengers apply for admission to the United States as refugees. In a more limited sense, it would permit carriers, whether motivated by humanitarian concerns or financial considerations, to bring to the United States with impunity an unlimited number of the world's homeless and/or oppressed people who would like to immigrate to the United States as refugees. The carrier's construction would thus undermine Congress' effort to limit the number of immigrants, including refugees, coming to the United States. This is the antithesis of section 273 of the Act and a complete reversal of a 56-year-old legislative theme. We have examined the legislative history of the Refugee Act of 1980 and found no evidence that Congress intended these results.

The carrier's argument that he is not liable for fines under section 273 because he acted under duress has been rejected by this Board. *See Matter of M/V "Emma"*, *supra*.

We conclude that as the carrier's passengers had neither visas, nor other documents authorized under the regulations for use in lieu of visas, the carrier is liable for a fine of $1,000 per alien. As the District Director, in the exercise of his prosecutorial discretion, has imposed fines for only five of the violations, the carrier is liable for only $5,000.

The carrier contends that he is entitled to remission of the fines under section 273(c) of the Act because he exercised reasonable diligence in that, in making his decision to go to Cuba, he relied upon the analysis of the Refugee Act of 1980 set forth above, former President Carter's "open hearts and open arms" policy, and announcements on several occasions by officers of the Coast Guard, United States Customs Service, and the Immigration and Naturalization Service that no penalties would be imposed if all refugees were brought to specific points in the United States.[9] He argues that under these circumstances, it was reasonable for him to conclude that no visas were required of Cuban nationals.

---

ality Act of 1952 (Public Law 414, 66 Stat. 166). *See Matter of S.S. "Greystroke Castle" and M/V "Western Queen"*, 6 I&N Dec. 112 (BIA 1954; A.G. 1954).

[9] We find this carrier to be more blameworthy than he has acknowledged. While the United States government was attempting to formulate national policy regarding Cuban nationals who wished to seek asylum here, private boat owners, including this carrier exploited the void and seized the opportunity to bring to the United States relatives whom the United States government may or may not have allowed to come in accordance with

We find that the carrier has not established that he exercised reasonable diligence because his contentions are not supported by evidence in the record. For instance, the first time the carrier alleged that he thought that the visa requirements of the Act were waived by the Refugee Act of 1980 was in counsel's brief on appeal. Such arguments by counsel are not evidence. *Matter of Ramirez-Sanchez*, 17 I&N Dec. 503 (BIA 1980). Further, the fact that the argument was first raised on appeal suggests that it was an afterthought developed to justify the carrier's action, rather than one of the considerations upon which he decided to act.

The carrier's contention that he relied upon former President Carter's "open hearts and open arms" policy is also not substantiated in this record. Former President Carter referred to "open hearts and open arms" when addressing the League of Women Voters in Washington, D.C., on May 5, 1980. *See* Weekly Compilation of Presidential Documents, Monday, May 12, 1980, page 834. However, as the carrier left the United States for Cuba on April 25, 1980, he could not have relied on that statement. Further, even if the carrier had heard the statement, we still would not find that the carrier exercised reasonable diligence because there was nothing in the statement which could reasonably be construed as waiving the visa requirements of the Act or authorizing this carrier to bring undocumented Cuban nationals to the United States.

The carrier has also failed to establish that anyone in a position of authority advised him that no penalty would be imposed if he brought undocumented Cuban nationals to the United States. His affidavit is the only evidence in the record relevant to this issue and it lacks sufficient factual allegations to make it credible. It does not allege that anyone authorized the carrier personally to bring undocumented Cubans to the United States. It does not identify the person or persons who allegedly made the announcements that no penalty would be imposed, and it does not state when, where, or to whom the alleged announcements were made.

Finally, in *Matter of M/V "Emma"*, *supra*, we held that it was not reasonable diligence for a carrier to assume that the government consented to the bringing of undocumented Cubans to the United States without making any inquiries to determine the legality of this action. We note that the obvious place for the carrier to have inquired as to the legality of bringing Cuban nationals to the United States was the Immi-

---

the law. In this instance, while former President Carter moved pursuant to section 207 of the Act to authorize the lawful admission of some 3,500 Cuban refugees (*see* 45 Fed. Reg. 28079 (April 14, 1980)), private boat owners, including this carrier, took it upon themselves to bring to the United States some 125,000 Cuban nationals without regard to those aliens' rights, or lack thereof, to come to the United States. In so doing, they usurped the authority given the Attorney General by statute.

gration and Naturalization Service, the agency charged with responsibility for administering our immigration laws. The carrier has not alleged that he made any such inquiry to the Service or anyone else.

Accordingly, the following order will be entered.

**ORDER:** The appeal is dismissed.