MATTER OF M/V "SOLEMN JUDGE"

In Fine Proceedings

MIA 10/12.1785

*Decided by Board January 21, 1982*

(1) In the absence of a showing of "affirmative misconduct" on the part of a government agent, the Board of Immigration Appeals decided not to meet the issue of whether the doctrine of estoppel can be applied against the government; "affirmative misconduct" was not shown by the fact that former President Jimmy Carter issued Presidential Determination No. 80-16 on April 14, 1980, or his "open hearts and open arms" speech on May 5, 1980; likewise, "affirmative misconduct" was not demonstrated by the absence of a warning to the carrier by the United States Coast Guard or the United States Customs Service concerning the subject of administrative fines for bringing undocumented aliens to the United States or by the fact that the Customs Service issued the carrier clearance to travel to Cuba.

(2) The Attorney General has delegated to the Commissioner of the Immigration and Naturalization Service the authority to enforce the provisions of the Immigration and Nationality Act and the Commissioner, through his delegate, the District Director, properly exercised that authority under the provisions of section 273(b) of the Act.

(3) The carrier became liable to fines under the provisions of section 273 of the Act by transporting undocumented alien passengers to the United States and, therefore, cannot claim exemption from liability merely by delivering his passengers to the Immigration and Naturalization Service for inspection upon arrival in the United States.

(4) The failure of the Immigration and Naturalization Service to respond to the request of the carrier to provide him with addresses of the undocumented alien passengers that he brought to the United States is not a denial of due process of law.

(5) The District Director's decision to impose or not to impose fines for violations of section 273 of the Act involves the exercise of prosecutorial discretion which is not reviewable by the Board of Immigration Appeals.

(6) Remission of fines under section 273(c) of the Act is not warranted because the carrier failed to exercise reasonable diligence in ascertaining and complying with the requirements of the law for bringing alien passengers to the United States.

(7) The defense of duress is not available to the carrier seeking remission of fines under section 273(c) of the Act for the reasons that his objective in bringing immigrants to the United States who did not have proper documentation was contrary to the law; that his action in doing so was not prudent; and that he, in effect, usurped the authority of the Attorney General by precluding the government from screening those immigrants who were inadmissible under United States law.

In re: M/V "Solemn Judge", which arrived at Key West, Florida, from Cuba on May 25, 1980. Alien passengers involved: Carlos Gonzalez-Guiu, Elena Hernandez-Guiu, Myrna Martinez-Martinez, Isriano Uicario-Duran, Michel Menez-Segredo, Gilberto Sanchez, et al.

BASIS FOR FINE: Act of 1952—Sec. 273 [8 U.S.C. 1323]—Bringing to the United States immigrants not in possession of unexpired visas

ON BEHALF OF CARRIER:
Alfred K. Frigola, Esquire
Frigola and De Vane, P.A.
First Professional Centre
Suite 17
5701 Overseas Highway
P.O. Box 177
Marathon, Florida 33050

ON BEHALF OF SERVICE:
Gerald S. Hurwitz
Appellate Trial Attorney

BY: Milhollan, Chairman; Maniatis, Maguire, Morris, and Vacca, Board Members

On February 9, 1981, the District Director in Miami imposed administrative fines totalling $190,000 upon Nevin Stewart, Jr., captain/owner of the M/V Solemn Judge (hereinafter referenced as the "carrier"), for 190 violations of section 273(a) of the Immigration and Nationality Act, 8 U.S.C. 1323(a).[1] The District Director also determined that the carrier had not met the requirements for remission of the fines. The carrier has appealed. The appeal will be dismissed..

The record reflects that the carrier chartered his vessel for $1,000 per day to go to Cuba for the purpose of picking up 54 Cuban nationals and returning with them to the United States. It further reflects that he departed from the United States for Cuba on April 29, 1980; and that he returned from Cuba to Key West, Florida, on May 25, 1980. Upon his arrival in the United States, he was served with a Notice of Intention to Fine charging him with having brought to the United States 191 Cuban nationals who did not have valid unexpired visas for entry. The carrier filed a written defense and appeared for an interview on September 15, 1980. An immigration officer found the carrier subject to fines under section 273 of the Act for 190 violations. He recommended that the District Director impose the statutory $1,000 per alien fine with respect to all 190 violations. The District Director accepted that recommendation.

The statute under which the fines were imposed in this case is clear. Section 273(a) of the Act provides: "It shall be unlawful for any person . . . to bring to the United States from any place outside thereof . . . any alien who does not have an unexpired visa, if a visa was required under this Act or regulations issued thereunder." Section 273(b) provides that the fine for each violation of subsection (a) shall be $1,000. Section 273(c) provides: "Such sums shall not be remitted or refunded, unless it appears to the satisfaction of the Attorney General that such person . . . prior to departure of the vessel or aircraft from the last port outside of the

---

[1] This case is one of approximately 38 cases with respect to which the legal issues were consolidated for oral argument on August 24, 1981.

United States, did not know, and could not have ascertained by the exercise of reasonable diligence, that the individual transported was an alien and that a visa was required."

It is important to note that fines under section 273 of the Act are imposed without regard to the intentions of the carrier. It is not necessary for there to be a willful disregard of United States law. Under section 273 the carrier becomes, in effect, an insurer that its passengers have met the visa requirements of the Act. Any bringing to the United States of an alien who does not meet these requirements incurs liability. *Matter of M/V "Emma"*, 18 I&N Dec. 40 (BIA 1981); *Matter of Swissair, "Flight #164"*, 15 I&N Dec. 1 (BIA 1974). Further, there is no provision for mitigation of such fines. Section 273(c) permits remission (forgiveness in full) in only one circumstance: where it appears that prior to the alien's departure from the last port outside of the United States, the carrier did not know, and could not have ascertained by the exercise of reasonable diligence, that the individual transported was an alien and that a visa was required. What constitutes "reasonable diligence" varies according to the circumstances of the case. *Matter of S.S. "Florida"*, 3 I&N Dec. 1 (BIA 1947, 1948; A.G. 1948).

The carrier has raised a number of contentions in these proceedings. We state and address them in turn.

The carrier argues that the government should be estopped from imposing fines in this case because it encouraged him to go to Cuba and did not warn him that he was subject to fines if he brought undocumented Cuban nationals to the United States. The carrier contends that he went to Cuba after former President Carter determined on April 14, 1980,[2] that persons who had taken sanctuary in the Peruvian Embassy in Havana and who otherwise qualified could be considered refugees, that an unforseen emergency refugee situation existed, and that the admission into the United States of 25 to 33 percent of these refugees up to a maximum of 3,500 refugees was justified by grave humanitarian concerns. The carrier also contends that he went to Cuba pursuant to former President Carter's "open hearts and open arms" policy. He further alleges that prior to his vessel's departure for Cuba, he went to a United States Customs Service office, advised the Customs Service of the nature of his voyage, paid a fee, and received a "Clearance of Vessel to a Foreign Port" authorizing him to travel to Cuba. The carrier adds that the Customs Service did not warn him that he was subject to a fine for transporting "refugees" to the United States.

The carrier's argument that the government should be estopped from imposing fines in this case is without merit. It was once thought to be

---

[2] The carrier refers to Presidential Determination No. 80-16 of April 14, 1980. *See* 45 Fed. Reg. 28079 (April 28, 1980).

well-settled that the doctrine of estoppel could not be applied against the government. *See Utah Power and Light Company v. United States,* 243 U.S. 389 (1917); *Federal Crop Insurance Corporation v. Merrill,* 332 U.S. 380 (1947). However, in two nationality cases, *INS v. Hibi,* 414 U.S. 5 (1973) and *Montana v. Kennedy,* 366 U.S. 308 (1961), the United States Supreme Court opened the possibility that the doctrine of estoppel might be applied against the government in a case where it is established that its agents engaged in "affirmative misconduct." Since these cases were decided, lower Federal courts have found "affirmative misconduct" and applied estoppel against the government in a number of cases.[3] However, the Supreme Court has not yet decided whether even "affirmative misconduct" is sufficient to estop the government. *Schweiker v. Hansen,* 101 S. Ct. 1468 (1981), *rehearing denied,* 101 S. Ct. 3023 (1981) (involving an application for Social Security benefits). See also *INS v. Miranda,* 102 S. Ct. 81 (1981), (judgment vacated and case remanded to Court of Appeals for further consideration in light of *Schweiker v. Hansen, supra*).

We need not face the issues of whether the doctrine of estoppel can be applied against the government in this case, or whether we have the authority to apply that doctrine, because we find that this carrier has not established any "affirmative misconduct" such as might warrant the application of that doctrine. We will consider the factors alleged as "affirmative misconduct" seriatim.

First, former President Carter's Determination of April 14, 1980, did not authorize private boat owners to bring undocumented Cuban nationals to the United States. The Determination was not even directed at private citizens. It was simply the means through which the President moved to accept a limited number of Cuban nationals into the United States in accordance with United States law (section 207 of the Act).

Second, the carrier has not established that there was any "open hearts and open arms" policy at the time of his departure from the United States. Former President Carter referred to "open hearts and open arms" when addressing the League of Women Voters in Washington, D.C., on May 5, 1980. See Weekly Compilation of Presidential Documents, Monday, May 12, 1980, page 834. However, as this carrier departed from the United States on April 29, 1980, he could not possibly have relied upon that statement in deciding to go to Cuba. In any event, there was nothing in that statement which could reasonably have been construed as waiving the visa requirements of the Act or authorizing this carrier to bring undocumented Cuban nationals to the United States. *See Matter of M/V "Runaway",* 18 I&N Dec. 127 (BIA 1981).

---

[3] See discussion in Judge Friendly's dissent in *Hansen v. Harris,* 619 F.2d 942 (2 Cir. 1980).

189

Third, the carrier has not established that either the United States Coast Guard or the United States Customs Service had any legal duty to warn him that he would be subject to fines if he brought undocumented Cuban nationals to the United States. *Compare Corniel-Rodriguez v. INS*, 532 F.2d 301 (2 Cir. 1976).

Finally, we find no affirmative misconduct in the fact that the United States Customs Service cleared the carrier's vessel for travel to Cuba. The United States Attorney General has rendered the opinion that such clearance must be granted in the absence of statutory authority for denying clearance. *See* 46 U.S.C. 91 and 29 Op. Atty. Gen. 364 (1912); *see also* 34 Op. Atty. Gen. 244 (1923). The carrier has not established any statutory authority under which the Customs Service might properly have denied clearance in this case. Furthermore, we see no reason why the carrier should have been misled by the clearance. The clearance document in this case is entitled "CLEARANCE OF VESSEL TO A FOREIGN PORT." This document does not mention aliens, refugees, visas, or return of the vessel to the United States. The document cleared the carrier's vessel for travel to a foreign port: it did not purport to authorize the vessel's return with undocumented aliens.

Thus, we conclude that the carrier has not established that the government engaged in any "affirmative misconduct" such as might warrant application of the doctrine of estoppel. *Compare* the facts in this case with those of *Schweiker v. Hansen, supra; INS v. Hibi, supra* (note especially the dissent); and *Montana v. Kennedy, supra*.

The carrier argues that he is not liable for fines in this case because 138 of his passengers were forced upon his boat by Cuban authorities and brought to the United States under duress. We have previously rejected this argument on the ground that section 273 of the Act imposes strict liability. *Matter of M/V "Emma", supra*. Later in this order, we will consider the defense of duress in connection with the carrier's application for remission of the fines.

The carrier also contends that section 273(b) requires a decision by the Attorney General before a fine can be imposed under this section. We find this contention to be without merit. The Attorney General has delegated his authority to make such determinations to the Commissioner of the Immigration and Naturalization Service and the Commissioner, through his delegate, the District Director, has properly exercised it in this case. *See* 8 C.F.R. Part 100. That the Attorney General can delegate his authority in this manner has been recognized by the United States Supreme Court. *Jay v. Boyd*, 351 U.S. 345 (1956); *Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

The carrier contends that he is not liable for fines in this case because his passengers were not brought to the United States within the meaning of section 273 of the Act because they were delivered to the Immigra-

tion and Naturalization Service at Key West, Florida. We find this contention to be without merit. The carrier violated section 273 of the Act by transporting his undocumented passengers to the United States. *Peninsular and Occidental Steamship Company v. United States*, 242 F.2d 639 (5 Cir. 1957); *Matter of M/V "Runaway", supra; Matter of Aircraft "VT-DJK"*, 12 I&N Dec. 267 (BIA 1967); *Matter of Plane "F-DHSQ"*, 9 I&N Dec. 595 (BIA 1962). The carrier is not relieved from liability merely because he presented his passengers for inspection: that was clearly his duty under section 271 of the Act, and he would have been liable for additional fines under section 271 had he allowed his passengers to land at a time or place other than as directed by an immigration officer. Further, had the carrier attempted to discharge his passengers in such a manner as to have permit inspection by an immigration officer, he would have subjected himself to potential criminal liability under section 274 of the Act.

The carrier's argument that his passengers were not required to have visas because that requirement was waived by the Refuge e Act of 1980 is without merit. We have previously held that Cuban nationals who came to the United States in the "Freedom Flotilla" of 1980 without first having filed Form I-590 (Registration for Classification as a Refugee) and having received approval for admission as refugees under section 207 of the Act are not exempt from the Act's visa requirements by virtue of the Refugee Act of 1980. *Matter of M/V "Runaway", supra*. This carrier has not alleged that any of his passengers filed Form I-590 before departing Cuba.

The carrier also contends that he has been denied due process of law in these proceedings because the government has failed to honor his request for the names and addresses of all the passengers the carrier brought to the United States. He argues that he needs this information so he can interview these people and determine whether they were aliens and whether any of them had visas. We find that the procedure below was in compliance with 8 C.F.R. Part 280. We note that all relevant parties were provided copies of the passenger list. Therefore, the only information that the carrier asked for but did not receive was the addresses of his passengers. We are aware of no requirement for the Service to gather and provide this information to a carrier upon request. There is no such requirement in 8 C. F.R. Part 280. We also note that the carrier does not contend that any of his passengers were not aliens or that any one of them had a visa. He claims only that he does not know. However, he was required by section 273 of the Act to obtain this information with respect to each passenger before bringing the passenger to the United States. The record contains evidence reflecting that each of the carrier's passenger was an alien and that each arrived in the United States without a visa. Each passenger was inspected upon arrival

in the United States and a Form I-94 was completed. These Forms I-94 indicate the individual's name; country of citizenship; passport or alien registration number, if any; the airline and flight number or vessel of arrival; the month, day, and year of birth; country of birth; where any visa was issued; the month, day, and year the visa was issued; and the date of arrival in the United States. In this case, the Forms I-94 indicate that the carrier's passengers were citizens of Cuba and that none of them had a visa at the time of arrival in the United States. *See Matter of Swissair, "Flight SR 168"*, 15 I&N Dec. 372 (BIA 1975).

The carrier's contention that these proceedings are invalid because of selective enforcement of the law by the Service is not established in this record. The carrier has alleged that the Service arbitrarily served Notices of Intention to Fine on some vessels and failed to serve such notices upon other vessels. However, there is no evidence in this record to support the carrier's allegation. Further, we have seen no evidence of the type of selective enforcement that the carrier alleges in any of the other cases which we have reviewed.

The carrier also contends that the District Director abused his discretion in finding that the carrier's trip to Cuba was "profit-motivated", and that he improperly refused to exercise his discretion and cancel a portion of the fines in this case. This allegation does not raise an issue which is within our power to review. We are aware that the District Director followed a policy of imposing fines only for the number of aliens that the carrier originally intended to bring to the United States unless he found that the carrier's trip was profit-motivated or that the carrier left the United States after it had become common knowledge that Cuban authorities were forcing passengers upon the vessels. However, the District Director used this policy to guide himself in the exercise of his prosecutorial discretion, a matter over which we have no power of review. Cf. (deportation cases) *Matter of Ramirez*, 17 I&N Dec. 503 (BIA 1980); *Matter of Marin*, 16 I&N Dec. 581 (BIA 1978); *Matter of Geronimo*, 13 I&N Dec. 680 (BIA 1971).

In this case, the carrier has acknowledged that he brought approximately 190 undocumented Cuban nationals to the United States. The record contains 190 Forms I-94, which indicate that the carrier brought 190 Cuban nationals to the United States, none of whom was in possession of proper documents. Therefore, we conclude that 190 violations of section 273 have been established and that the carrier is liable for fines in the amount of $190,000.

The remaining issue to be considered is whether the carrier is entitled to remission under section 273(c) of the Act. Section 273(c) precludes remission of the fines "unless it appears to the satisfaction of the Attorney General that such person, and the owner, master, commanding officer, agent, charterer, and consignee of the vessel or aircraft, prior to

departure of the vessel or aircraft from the last port outside the United States, did not know, and could not have ascertained by the exercise of reasonable diligence, that the individual transported was an alien and that a visa was required." The carrier argues that he should be found to have exercised reasonable diligence under this section because he obtained a clearance from the United States Customs Service for his vessel to travel to Cuba and because 138 of his 190 passengers were forced upon his vessel by Cuban authorities and brought to the United States under duress.[4] The carrier alleges that after former President Carter's statement of May 14, 1980, urging boat owners to return to the United States without passengers, that he attempted to do so but was precluded from returning without passengers by Cuban gunboats and by his 29 Cuban-American passengers who did not want to return without their relatives. The carrier also alleges that he twice called and advised the United States Coast Guard of his situation and requested advice. He states that in each instance he was advised that the Coast Guard could not come into Mariel harbor to help him and that he should do whatever was necessary to preserve life and for the safety of his vessel.

In *Matter of M/V "Emma", supra,* we rejected a "duress" argument similar to the present one. In *Emma* we acknowledged that what constitutes reasonable diligence varies with the circumstances of each case. *Matter of S.S. Florida, supra.* We held that under the circumstances of the Freedom Flotilla of 1980, a carrier would not be found to have exercised reasonable diligence within the meaning of section 273 unless he exerted a reasonable effort to ascertain the requirements of the law before he departed for Cuba, and he exercised reasonable prudence in determining to go to Cuba. In *Emma, supra,* we found the carrier had failed to do either. We reach the same conclusion here.

The carrier presents the argument of duress to establish compliance with the reasonable diligence standard of section 273(c) on the theory that at the time the statute requires that reasonable diligence be exercised, the carrier had no opportunity to do so because his only viable option was to do as directed by Cuban authorities. We reject this argument because we find that the carrier subjected himself to the jurisdiction of Cuban authorities in pursuit of an objective contrary to United States law.

We recognize that the circumstances of the Freedom Flotilla are different from our reported cases in many ways, especially in that these carriers an usually commercial carriers, but are fishermen, pleasure boat operators, and even some people with no connection to the sea. The

---

[4] Fifty-two of his passengers were aliens whom he originally intended to bring to the United States.

carrier argues that this distinction militates toward remission of the fines on the theory that he should not be expected to know the requirements for bringing immigrants to the United States. However, we view the situation differently. Since this carrier was not a commercial carrier, he was obligated to make appropriate inquiries and determine what the legal requirements were before undertaking to bring aliens to the United States. This rationale underlies our holding that reasonable diligence under these circumstances requires that the carrier make a reasonable effort to ascertain the requirements for bringing aliens to the United States before departing for Cuba.

The fact that this carrier was not a commercial carrier militates against accepting his argument of duress in another way. A commercial carrier coerced into bringing undocumented aliens to the United States on a regularly scheduled trip from Europe, for example, could not be faulted for having his vessel in Europe for routine business operations. This carrier, however, was not routinely in Cuba or there on legitimate business. He was there for the sole purpose of bringing Cuban immigrants to the United States, an objective which was unlawful inasmuch as the passengers he intended to bring to the United States needed, but did not have visas.

We find that the carrier's inquiry to the United States Customs Service which resulted in a "Clearance of Vessel to a Foreign Port" being issued to him does not constitute a reasonable effort to ascertain the requirements of the law. What the carrier wanted to do was to bring Cuban immigrants to the United States. Therefore, we think he should have inquired of the Immigration and Naturalization Service or some other immigration authority about the legality of his proposed venture. We are not satisfied that the United States Customs Service is such an authority.

We also find that the carrier's decision to bring Cuban nationals to the United States was not prudent. We recognize that there was much confusion both in South Florida and Cuba at the time of the boatlift. However, rather than justifying or excusing this carrier's action, we think that that confusion should have provoked caution, both for reasons of personal safety and because of potential civil and criminal liability. Instead of proceeding cautiously, the carrier gambled that what he was about to do was legally permissible or that he would not be punished for it in any event. While former President Carter moved pursuant to section 207 of the Act to authorize the lawful admission of some 3,500 Cuban refugees,[5] private boat owners, including this carrier, took it upon themselves to bring to the United States some 125,000 Cuban nationals. In so doing, they usurped the authority given the Attorney

---

[5] *See* note 2, *supra.*

194

General by law, subverted the Congressional purpose manifested in section 207 of the Refugee Act of 1980 to limit the number of refugees admitted to the United States, and precluded the government from screening out those inadmissible under our law. They brought immediate relatives and hardened criminals without distinction.

In summary, we conclude that this carrier went to Cuba for the purpose of bringing Cuban nationals to the United States; that he departed on his mission without having made a reasonable effort to determine the legal requirements for bringing immigrants to the United States; and that he acted imprudently in subjecting himself and his vessel to the jurisdiction of Cuban authorities. Under these circumstances, we do not believe the carrier is entitled to remission under section 273(c) of the Act merely because the Cuban government and/or the party that chartered his boat refused to allow him to change his mind after he arrived in Cuba and required him to accept on his vessel undocumented passengers in addition to those he had originally intended to bring to the United States. We, therefore, reject the carrier's defense of duress and find that remission of the fines is not warranted.

Accordingly, the following order will be entered.

**ORDER:** The appeal is dismissed.